**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| APACHE ENERGY SERVICES, LLC | § | Chapter 11 |
| Debtor | § | Case No. 15-60069 (DRJ) |
| | § | |
| In re: | § | |
| HII TECHNOLOGIES, INC. | § | Chapter 11 |
| Debtor | § | Case No. 15-60070 (DRJ) |
| | § | |
| In re: | § | |
| AQUA HANDLING OF TEXAS, LLC | § | Chapter 11 |
| Debtor | § | Case No. 15-60071 (DRJ) |
| | § | |
| In re: | § | |
| HAMILTON INVESTMENT GROUP | § | Chapter 11 |
| Debtor | § | Case No. 15-60072 (DRJ) |
| | § | |
| In re: | § | |
| SAGE POWER SOLUTIONS, INC. f/k/a | § | Chapter 11 |
| KMHVC, INC. | § | Case No. 15-60073 (DRJ) |
| Debtor | § | |
| | § | **(Joint Administration Requested)** |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL**
**AND GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER**
**AND (B) SCHEDULING A FINAL HEARING**

**NOTICE UNDER BLR 4001-1(b)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY
CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU
AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A
RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST
FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE
THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE
MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY
RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER

NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

THE DEBTORS HAVE REQUESTED THAT THIS MOTION BE CONSIDERED AT THE DEBTORS' FIRST DAY HEARINGS.

**To the Honorable David R. Jones,**
**United State Bankruptcy Judge:**

HII Technologies, Inc. ("HII") and its above-captioned affiliated debtors (collectively, the "Debtors"), in the above-captioned bankruptcy cases (the "Cases") file this emergency motion (the "Motion") to obtain post-petition credit to provide a facility of $500,000 in new money and refinance approximately $11.2 million in prepetition debt to 1) effectuate a sale of assets not being retained for operations by the Debtors, and 2) undertake steps towards a plan of reorganization with the objective of preserving and maximizing value through a strategic transaction to preserve the existing business status as a public company and its economic and tax benefits.

1.     By this Motion and for the reasons set forth below, pursuant to 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), the

Debtors respectfully request entry of an interim order the "Interim Order") and a final order (the

"Final Order") seeking, among other things:

    a)    authorizing the Debtors, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014, to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and to obtain from McLarty Capital Partners SBIC, L.P., a Delaware limited partnership ("MCP"), as the administrative and collateral agent, and Heartland Bank, an Arkansas state bank ("Heartland") and MCP, as lenders (collectively, the "DIP Lenders") a senior secured superpriority debtor-in-possession term loan facility (the "DIP Facility") with a commitment in an aggregate principal amount of up to $12 Million (the "Commitment"), comprised of (i) an amount up to $500,000 in respect of new money funding (the "New Money Loan"); (ii) a dollar-for-dollar roll-up as Cash Collateral is used by the Debtors, subject to and in accordance with the approved budget (the "Budget"), attached hereto as Exhibit A, subject to Permitted Variances (as defined below) based on written consent by MCP as the administrative and collateral agent under the DIP Facility under a collateral agreement acting for the DIP Lenders (the "DIP Agent") from the date of the entry of the interim order (the "Interim Order") until the date of the entry of the final order (the "Final Order", and together with the Interim Order, the "DIP Order"); and (iii) a roll-up in the amount of $11.5 million in respect of outstanding loans and obligations under the Prepetition Credit Agreement and Prepetition A/R Agreement (the "Roll-Up Loan") occurring promptly upon the entry of the Final Order, in accordance with the DIP Facility Term Sheet set forth herein;

    b)    authorizing the Debtors to execute and deliver the DIP Facility Term Sheet and to perform such other and further acts as may be necessary and appropriate in connection therewith and, on an interim basis, in accordance with the Budget, to use Cash Collateral and to access the DIP Facility, pursuant to the DIP Facility Term Sheet;

    c)    authorizing the Debtors, pursuant to the DIP Facility Term Sheet, to use the DIP Facility, solely in accordance with the Budget", and not otherwise prohibited under the DIP Facility Term Sheet, (i) for working capital purposes and payment of administrative fees, costs and expenses incurred in the Cases; (ii) to pay all principal, interest, fees, expenses and other amounts payable to the DIP Lenders under the DIP Facility as such amounts become due and payable, as provided hereunder and in the DIP Documentation; and (iii) to repay in full all loans, obligations, and other amounts outstanding under the DIP Loans, Prepetition Credit Agreement and/or Prepetition A/R Agreement;

    d)    entering orders, first at an interim and then at a final hearing, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, to provide that the obligations of the Debtors to the DIP Lenders under the DIP Facility Term Sheet (the "DIP Obligations") (i) be granted an allowed superpriority administrative expense claim against each Debtor (the "Superpriority Claim") pursuant to section 364(c)(1) of the

Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtors, including, but not limited to, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 and 1114 of the Bankruptcy Code, subject only to the Carve-Out; (ii) subject only to the Carve-Out, be secured (A) under section 364(d) of the Bankruptcy Code, by valid, fully perfected, unavoidable, priming first-priority security interest in the Collateral (as defined herein); (B) under section 364(c)(2) of the Bankruptcy Code, by valid, fully perfected, unavoidable, first priority, senior security interests in and liens on all of the all of the Collateral; and (C) under section 364(c)(3) of the Bankruptcy Code, by valid, fully perfected, unavoidable, junior priority, security interests in and liens on all of the Debtors' currently owned and after acquired encumbered property (collectively, the "Post-Petition Liens");

e)        granting to the Prepetition Lenders (as defined below), as adequate protection for any diminution in the value of their collateral resulting from the Debtors' use of cash collateral, the priming liens in favor of the DIP Obligations, or otherwise, (i) replacement liens on all collateral, subordinate only to the liens in favor of the DIP Obligations and the Carve-Out, (ii) superpriority administrative expense claims junior only to the superpriority administrative expense claims of the DIP Lenders and subject to the Carve-Out, and (iii) payment of fees and expenses of the Prepetition Agent and Prepetition Lenders, which shall be reimbursed in cash on a current basis (collectively, "Prepetition Lenders' Replacement Liens and Protections");

f)        authorizing, with respect to the proceeds of the DIP Facility, the refinancing in full, on the Closing Date (as defined below), of the outstanding principal amount of the Pre-Petition Senior Secured Loans, subject to the reservation of rights of parties in interest under the Interim Order;

g)        authorizing (i) the DIP Agent to terminate the funding commitments under the DIP Agreement, and (ii) the DIP Agent to terminate the Debtors' sale, use, or lease of Cash Collateral, each upon the occurrence and continuance of an Event of Default (as defined in the DIP Facility) on the terms specified herein;

h)        subject to the entry of the Final Order, authorizing the waiver of the Debtors' right to assert any claims to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code;

i)        modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim Order, and, as later applicable, the Final Order;

j)        waiving any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Order, and as later applicable, the Final Order;

k)        scheduling an emergency interim hearing (the "Interim Hearing") on this Motion for the Court to consider entry of the Interim Order; and

l)      scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on this Motion for a date that is before the 45th day after the Petition Date (as defined below) to consider entry of the Final Order authorizing the Debtors to use Cash Collateral and to obtain, on a final basis, the DIP Facility, pursuant to the DIP Facility Term Sheet.

In support hereof, the Debtors rely on the declaration of Loretta Cross (the "First Day Declaration"), filed concurrently with the Motion on September 18, 2015 (the "Petition Date"). In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

2.      This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K) and (M).  The Court can enter final orders consistent with Article III of the United States Constitution. Venue of these cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1 and 9013-1.  The lead debtor, Apache Energy Services, LLC operates in and has its main assets in Goliad, Texas in the Victoria Division of the Southern District of Texas.

## BACKGROUND

3.      HII is an oilfield services company with operations in Texas, Oklahoma, Ohio and West Virginia focused on commercializing technologies and providing services in frac water management, safety services and portable power used by exploration and production ("E&P") companies in the United States.  It is traded on the OTCQB under the Stock Symbol "HIIT".  It was formed as a "roll up" of smaller oilfield service companies under a single umbrella.  In May

2015, the Debtors employed 103 persons and extensively used independent contractor crews in connection with field service work.

4.     The "crown jewel" of the HII group is the use of patented "HydroFLOW" non-chemical bacterial elimination technology; a part of its frac water management services. This provides a chemical-free bacteria neutralization system for stored water to be used in fracing and on-the-fly treatment during water transfer to frac jobs which has a bacterial kill rate of 99%. Measuring bacterial kill can be accomplished by an onsite bacteria testing unit which verifies efficacy of the HydroFLOW technology. This technology compliments traditional oilfield water management services referred to as flow back and water transfer.

5.     HII operates through wholly-owned subsidiaries.  The table below provides an overview of the current subsidiaries and their oilfield service activities:

| **Name** | **Doing Business As (dba)**: | **Business** |
| --- | --- | --- |
| Apache Energy Services, LLC | AES Water Solutions | Frac Water Management Solutions |
| | AES Safety Services | Oilfield Safety Services |
| Aqua Handling of Texas, LLC | AquaTex | Frac Water Management Solutions |
| Hamilton Investment Group | Hamilton Water Transfer | Frac Water Management Solutions |
| Sage Power Solutions, Inc. | Sage Power, South Texas Power, or STP | Oilfield Power Management Solutions |

6.     **AES.**  In 2012, HII Technologies sold its former operations leaving a public "shell".  HII began to acquire oilfield service assets.  On September 27, 2012, HII acquired all of the outstanding membership interests of Apache Energy Services LLC (dba AES Water Solutions), a Nevada limited liability company ("AES").  AES is a water transfer services company serving oilfield customers.  AES grew into a  "total frac water management services company" doing business as AES Water Solutions and providing  equipment, logistics and

services associated with the millions of gallons of water typically used during hydraulic fracturing and completions of horizontally drilled oil and gas wells.  On November 12, 2013, HII acquired Aqua Handling of Texas, LLC. (dba AquaTex) a frac water transfer company.  On August 12, 2014, HII acquired Hamilton Investment Group, Inc. ("Hamilton Water Transfer" or "Hamilton"), another frac water transfer company.

7.    **AES Safety Services**.  In January 2013, HII launched AES Safety Services, a division that offers contract safety engineers and professionals, safety training and onsite safety inspection services for E&P companies that prefer outsourcing many of their safety programs, or are required to by state regulation.  AES Safety Services is HII's oilfield safety consultancy providing experienced trained safety personnel such as contract safety engineers during oilfield operation from site preparation "rigging up" to drilling and completion for E&P customers.  AES Safety Services provides flexibility as outsourced safety consultants, training and inspection to its customers to move quickly in key locations.  Operations were halted before the Chapter 11.

8.    **Sage Power**.  In December 2012, HII launched a mobile oilfield power solutions and services business, which is being conducted through the wholly-owned subsidiary, Sage Power Solutions, Inc. f/k/a KMHVC, Inc. dba South Texas Power, or STP.  HII's oilfield mobile power subsidiary, Sage Power Solutions, does business as South Texas Power (STP) and operates a fleet of mobile generators, light towers and related equipment for in-field power rental where remote locations provide little or no existing electrical infrastructure.

9.    HII's executive offices are located at 8588 Katy Freeway, Suite 430, Houston, Texas, 77024. Apache Energy Services, its largest subsidiary, is based at 793 Charco Street, Goliad, Texas and maintains its assets there.  Sage Power Systems f/k/a KMHVC, Inc. – South

Texas Power (STP) operates from 1551 Damron Street, Tuleta, Texas. Hamilton formerly operated in Oklahoma and AquaTex formerly operated in Texas.

10.     The Debtors' immediate objectives in commencing these chapter 11 cases are to minimize any loss in the value of their assets, preserve enterprise value, and maximize creditor recoveries. To accomplish these ends, the Debtors intend to sell at auction many of their assets, but retain such assets as would permit a recapitalization by a strategic partner that would preserve the public status of the company and its tax losses.

11.     The auction should create a mechanism by which the free market values the assets and gives the greatest recovery to the unsecured creditors.

## FACTS RELEVANT TO THIS MOTION

### A.     The Debtors' Prepetition Capital Structure and Loan Facility.

12.     Pursuant to that certain senior secured credit facility (the "Facility" or "Pre-Petition Senior Loan") entered into on August 12, 2014 by and between the Debtors and Heartland Bank as Agent, consisting of two parts: (a) that certain Credit Agreement dated as of August 12, 2014, as amended and modified (the "Prepetition Credit Agreement"), by and between HII Technologies, Inc., a Delaware corporation, Apache Energy Services, LLC, a Nevada limited liability company, Aqua Handling of Texas, LLC, a Texas limited liability company, Hamilton Investment Group, an Oklahoma corporation, KMHVC, Inc n/k/a Sage Power Solutions, Inc., a Texas corporation (collectively, the "Borrowers"), and Heartland Bank, an Arkansas state bank ("Heartland"), as administrative agent (the "Prepetition Agent"), and McLarty Capital Partners SBIC, L.P., a Delaware limited partnership ("MCP"), together with Heartland, as lenders   (collectively, the "Prepetition Term Lenders"); and (b) that certain Account Purchase Agreement dated as of August 12, 2014, as amended (the "Prepetition A/R

Agreement" and together with the Prepetition Credit Agreement, the "Prepetition Loan Documents"), by and between HII Technologies, Inc., a Delaware corporation, Apache Energy Services, LLC, a Nevada limited liability company, Aqua Handling of Texas, LLC, a Texas limited liability company, Hamilton Investment Group, an Oklahoma corporation, KMHVC, Inc, a Texas corporation (collectively, the "A/R Borrowers") and Heartland, as administrative agent, and certain financial institutions and their successors and assigns (collectively, "Prepetition A/R Lenders", and together with the Prepetition Term Lenders, the "Prepetition Lenders"), which replaced the Debtors' previous senior secured revolving facility and was made for the purchase and sale of approved receivables in amounts not to exceed $6 million.[1]

13.     Debtors received proceeds of $12 million under the Prepetition Credit Agreement and approximately $4.65 million under the Prepetition A/R Agreement.  The Debtors utilized $9 million to pay a portion of the purchase price for the Hamilton acquisition, approximately $4.75 million to pay off the Debtors' prior accounts receivable facility, $450,000 in commitment fees, $675,000 to fund Debtors' debt service reserve account and approximately $190,000 in other expenses related to the Facility.  Debtors retained approximately $1.585 million for working capital.

14.     Under the original terms of the Prepetition Credit Agreement, borrowings bore interest at a rate per annum equal to WSJ prime plus a spread that ranged from 5.50% to 8.25% per annum depending on the Borrower's first lien leverage ratio (provided that at no time shall the WSJ prime be less than 4%).  The Prepetition Credit Agreement originally required monthly interest payments, quarterly principal payments of $300,000 and a balloon payment on the August 12, 2017 maturity date.  The Prepetition Credit Agreement contains an accordion feature,

---

[1]     This was increased to $6.6 million pursuant to a first modification agreement executed on September 15, 2014.

9

whereby the borrowings may be increased by up to an additional $10 million upon request and agreement by the Lenders, but is not a committed amount under the facility.

15.     The Lenders had rights in the sold accounts and their proceeds.  The Debtors are and were obligated to cooperate with the Lenders in enforcing those rights.  The Debtors also had obligations to account for proceeds received and deposit proceeds into a Heartland account, among other things.

16.     On May 20, 2015 the Debtors entered into a Third Modification and Waiver Agreement of the Prepetition Credit Agreement with Heartland Bank in which the Lenders waived certain existing defaults, waived default interest, and permitted an equity raise.  Under the same agreement the interest rate was increased to a nonvariable 13.75%, and the principal payment terms were changed to monthly payments of $110,000.  A balloon payment is still due on August 12, 2017 (the maturity date).

17.     Under the Prepetition A/R Agreement, all approved receivables were purchased by the lenders thereunder for the face amount of such receivable less the lender's 1.50% service charge. In addition, the Prepetition A/R Agreement requires a reserve that varies from 10%, 25%, to 50% based on the amount of the time the receivable is outstanding.

18.     The Prepetition Loan Documents were extended by numerous forbearances between July 1, 2015 and the Petition Date.  The terms of each forbearance allowed the Debtors to continue operations while they sought alternate financing and restructuring options.

19.     As of the Petition Date, the Debtors were truly and justifiably indebted to the Prepetition Lenders and Prepetition Agents, without defense, counterclaim or offset of any kind, in respect of (a) principal plus accrued but unpaid interest, costs, fees and expenses, in the approximate amount of $10,292,897.22 under the Prepetition Credit Agreement; and (b)

principal plus accrued but unpaid interest, costs, fees and expenses, in the approximate amount of $890,680.71 under the Prepetition A/R Agreement (collectively, the "Prepetition Secured Claims").

20.     Pursuant to the Prepetition Loan Documents, the Debtors granted to and/or for the benefit of the Prepetition Lenders, as security for the Prepetition Secured Claims, valid and fully perfected first-priority and continuing pledges, liens and security interests (the "Prepetition Liens") in and upon certain of the Debtors' real and personal property (the "Prepetition Collateral"), as more particularly described in the Prepetition Loan Documents.

21.     The Prepetition Secured Claims constitute legal, valid, enforceable, and binding obligations of each of the Debtors (the "Prepetition Secured Obligations"); (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Lenders against each of the Debtors; (e) the Prepetition Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable, and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral; (f) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge, or cause of action against the Prepetition Agent or Prepetition Lenders or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers,

directors, and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

22.     A list of the accounts that, as of the Petition Date, have been sold pursuant to the Prepetition A/R Agreement and that are thus not property of the estate is attached as Exhibit "1". The accounts are not property of the estate under Section 541 and thus the automatic stay of 11 U.S.C. §362(a) does not apply to those accounts.

23.     All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agent and Prepetition Lenders.

24.     **Capital Leases.**  The Debtor has a series of equipment leases.  On June 30, 2014, the Debtors entered into a lease agreement with BCL-Equipment Leasing, LLC ("BCL") under which it leased equipment with a capitalized cost of $3,244,976.  The lease term is for 24 months, with an automatic 12-month extension if the purchase option is not elected at the end of year.  The purchase price is for the greater of fair market value or 20% of the total capitalized cost.  The monthly payments under the lease are $150,769 and Debtors paid a security deposit of $657,243 and an origination fee of $32,347.  The equipment under the lease consisted of lay flat hose which is used in frac water transfer service related activities.

25.     On July 10, 2014, the Debtors entered into a lease agreement with Nations Fund I, LLC ("NEF") under which we leased equipment with a value of $1,908,542.  The lease requires 36 monthly payments during such term of $52,485 per month and a purchase at the end of term

of $572,563.  The lease contains a purchase option at the end of the initial 36-month term, granting the Company the right to purchase all equipment covered under the lease for its fair market value.  The equipment under the leases consisted of flowback equipment, evaporation units, and generators which are used in the Debtors' flowback, evaporation, and portable power service revenue activities.

26.     **Unsecured Debt.**  As set forth in more detail in the First Day Declaration, as of the Petition Date, the Debtors had aggregate outstanding unsecured debt of approximately $3 Million arising in connection with trade debt, accounts payable, accrued and other liabilities.

27.     **Intercompany Debts.**  The Company managed a centralized accounting system and unified cash management system that required significant amounts to be registered between the Debtors as Intercompany Debt.

28.     **Series B Shares.**  On May 20, 2015, HII issued a total of 2,735 shares of series B convertible preferred stock and warrants to acquire an aggregate of 3,418,750 shares of common stock to 14 accredited investors for an aggregate gross purchase price of $2,735,000.  Each share of series B convertible preferred stock had a par value of $1,000 and was convertible into shares of common stock.  The investors also received warrants to purchase additional shares of common stock.

29.     From these proceeds, approximately $1.97 million was used for payment of accounts payable and $757,575 were deposited into a restricted account with Heartland Bank which will be used for payment on the Company's term loan with Heartland Bank. The remainder was used to pay the costs and expenses associated with the offering and for working capital and general corporate expenses.

30.  **Series A Shares.**  From June 21, 2014 through July 8, 2014, HII sold 4,000 shares of Series A stock to 22 accredited investors at a price of $1,000 per Series A Unit for total gross proceeds of $4,000,000.  Each Series A share consisted of convertible shares and warrants to acquire more shares.  The Series A Conversion Shares and the Series A Warrant Shares contained standard piggy back registration rights.

31.  The Debtor used $242,700 of these proceeds as payment for nonexclusive placement agent fees to FINRA registered broker-dealers.  In addition, approximately $500,000 was used to repay outstanding indebtedness under 10% promissory notes.  The remaining proceeds were used for working capital and general corporate purposes and to fund growth opportunities.

**B.  Concise Statement of the Material Terms of the Proposed Interim Order.**

32.  Pursuant to Bankruptcy Rule 4001(b), the following summarizes the material terms of the Interim Order, which are discussed in more detail below:[2]

| BORROWERS: | HII Technologies, Inc., a Delaware corporation, Apache Energy Services, LLC, a Nevada limited liability company, Aqua Handling of Texas, LLC, a Texas limited liability company, Hamilton Investment Group, an Oklahoma corporation, and KMHVC, Inc. n/k/a Sage Power Solutions, Inc., a Texas corporation, as debtors in possession under Chapter 11 of the Bankruptcy Code (collectively, the "Borrowers" or the "Company"). |
|---|---|
| GUARANTORS: | Any guarantor executing a guaranty of obligations under the DIP Facility ("Guarantors") in favor of the DIP Agent (as defined below), for the benefit of the DIP Lenders.<br><br>The Company and corporate Guarantors (collectively, the "Debtors") shall file voluntary petitions and be debtors in possession under Chapter 11 of the Bankruptcy Code in jointly administered cases (the "Cases") in the Bankruptcy Court.<br><br>The date on which the Cases are commenced is referred to as the "Petition Date". |

---

[2]  The summary of the Interim Order is qualified in all respects by reference to the Interim Order.  In the event of any inconsistency between this Motion and the Interim Order, the Interim Order shall govern.

| | |
|---|---|
| **DIP AGENT:** | MCP shall be the administrative and collateral agent (the "DIP Agent") in connection with the DIP Facility under a collateral agreement acting for the DIP Lenders. |
| **DIP LENDERS:** | MCP and Heartland, as existing Prepetition Lenders under the Prepetition Credit Agreement, shall be the lenders with respect to the Roll-Up Loan and the New Money Loan (the "DIP Lenders"). |
| **DIP FACILITY:** | A senior secured super-priority term loan facility (the "DIP Facility") in an aggregate principal amount of up to $12 million (the "Commitment"), comprised of: |
| | (a) an amount up to $500,000 in respect of new money funding (the "New Money Loan") and |
| | (b) a dollar-for-dollar roll-up of $11.5 million in respect of outstanding loans and obligations under the Prepetition Credit Agreement and Prepetition A/R Agreement (the "Roll-Up Loan") occurring promptly upon the entry of the final order (the "Final Order"). |
| | The New Money Loan is a delayed draw term loan and shall not be a revolving credit facility. Therefore, the New Money Loan shall not be available to be re-borrowed. |
| | The Commitment will be made (but not funded to the Company) in two draws: (1) in the amount of $100,000, as approved by the Bankruptcy Court, occurring on the day an interim order (the "Interim Order", and together with the Final Order, the "DIP Order") is entered (or on such later date as mutually agreed between the Company and the DIP Agent, which shall not be more than five (5) business days following the Petition Date); and (2) the Roll-Up Loan plus any remaining undrawn New Money Loan, subject to the Funding Request (defined below), occurring on the day the Final Order is entered (or on such later date as mutually agreed between the Company and the DIP Agent). |
| | The New Money Loan will be funded on a weekly basis beginning on the first Monday after entry of the Interim Order or as otherwise agreed by the DIP Agent in writing.  Every Friday after entry of the Interim Order, the Debtors' CRO shall provide the DIP Lenders with a written request for funding, which shall be consistent with the Budget (the "Funding Request").  The DIP Lender will fund by the following Monday, in accordance with the Budget and the Debtor's request so long as no Event of Default occurred. |
| | Upon being drawn down after entry of the Final Order, proceeds of the New Money Loan will be deposited into one or more bank accounts of the Company reasonably acceptable to the DIP Agent (each, a "DIP Account"); provided that the DIP Agent shall at all times have a perfected first priority lien thereon as well as sole |

dominion and control, in either case, pursuant to the DIP Order and a deposit account control agreement to be executed promptly in a form and substance reasonably acceptable to the DIP Agent and the DIP Lenders.

Without the consent of the DIP Lenders, amounts in the DIP Account may be used by the Debtors solely for the purposes set forth in this Term Sheet and the budget, attached hereto as **Exhibit A** (the "Budget"), subject to any variances based on written consent by the DIP Agent (as described herein).

All sale proceeds, cash, hereafter acquired property, proceeds of litigations and insurance policies, account receivable collections, and all other Collateral subject to the DIP Liens shall be applied to reduce the DIP Loans on a weekly basis by the Debtors by the sweeping of the DIP Account.

Any amounts remaining in the DIP Account at the Maturity (defined below) or earlier termination of the DIP Facility (whether by acceleration or otherwise) shall be applied to reduce the DIP Loans (as defined herein) then outstanding (in such order or priority as determined by the DIP Lenders).

The DIP Facility will be documented pursuant to documentation to be agreed, including, without limitation, the DIP Order and the pleadings to be filed in the Bankruptcy Court seeking approval of the DIP Order (the "DIP Documentation").

The terms of any Interim Order and Final Order shall contain the Debtors' representations and acknowledgement of the validity and amount of the claims, security interests and liens of the Prepetition Agent, Prepetition Lenders and Prepetition A/R Lenders and shall be binding on the Debtors and any successors of the Debtors, including any chapter 7 or 11 trustee, and that the Roll-Up Loan will satisfy the obligations of the Prepetition Lenders and Prepetition A/R Lenders.  Further, subject to the Challenge Deadline (described herein), both the Interim Order and Final Order shall contain provisions that the Debtors and their estates, and their behalf and on behalf of their past, present and future successors, unconditionally, irrevocably and fully forever release, waive and discharge the Prepetition Agent, Prepetition Lenders and Prepetition A/R Lenders, and any of their respective affiliates, and each of their respective former, current, or future officers, directors, employees, representatives, owners, members, partners, shareholders, agents, financial advisors, and legal advisors from any and all claims, causes of actions, damages, liabilities, actions, and suits related to the claims, security interests, liens and related obligations under the Prepetition Credit Agreement and Prepetition A/R Agreement, including, without limitation, any so-called

| | |
|---|---|
| | "lender liability" or equitable subordination claims or defenses, any claims and causes of action arising under the Bankruptcy Code and applicable state law, and any claims and causes of action regarding the validity, priority, perfection or avoidability of the claims, security interests, and liens of the Prepetition Agent, Prepetition Lenders and Prepetition A/R Lenders.<br><br>The DIP Lenders shall not be required to marshal assets. |
| **PRIORITY AND SECURITY:** | Pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall be granted super-priority administrative expense claims (the "DIP Claims") in respect of the DIP Loans; pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Agent, on behalf of the DIP Lenders, shall be granted a first priority valid and perfected security interests and liens ("DIP Liens") on the Collateral (as defined herein) that is not subject to a valid, properly perfected and unavoidable lien or security interest on any such property as of the Petition Date, including without limitation, following entry of the Final Order, on claims and proceeds of actions under sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code and all avoidance actions under applicable state law, all known or unknown commercial tort claims and causes of actions and all proceeds thereof, all claims against former employees and all proceeds thereof, all claims for collection against customers and all proceeds thereof, all claims against the Hamiltons, One Flow and Water Transfer and all proceeds thereof, all insurance claims for stolen property and all proceeds thereof, all causes of actions and claims (whether asserted now or after the Petition Date) under the Debtors' existing directors and officers insurance policies and all insurance or other proceeds thereof; and pursuant to Section 364(c)(3) of the Bankruptcy Code, the DIP Agent, on behalf of the DIP Lenders, shall be granted a valid and perfected security interests and liens on any other property of the Company wherever located (now or hereafter acquired and all proceeds, products and offspring thereof) that is subject to a valid, properly perfected and unavoidable lien or security interest on any such property as of the Petition Date that is junior only to such existing security interests and liens.<br><br>The DIP Liens and DIP Claims shall be subject only to the Carve-Out. |
| **CARVE-OUT:** | "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) to the extent allowed at any time, but subject in all respects to the Budget covenant |

| | |
|---|---|
| | described herein, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any official committee of creditors (the "Committee") and allowed by the Bankruptcy Court at any time in an aggregate amount not to exceed $50,000 before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any official committee of unsecured creditors in an aggregate amount not to exceed $50,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").<br><br>For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee of creditors, if any, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **COLLATERAL:** | As used herein, the term "Collateral" shall mean all of the Company's present or future, tangible or intangible, pre-petition and post-petition real and personal property and other assets of any kind, including, without limitation, all accounts, cash, cash equivalents, deposit accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, leases, leasehold interests, real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles (including, without limitation, all known or unknown claims, causes of action, or choses in action under applicable federal and state law), all known or unknown commercial tort claims and causes of actions and all proceeds thereof, all claims against former employees and all proceeds thereof, all claims for collection against customers and all proceeds thereof, all claims against the Hamiltons, One Flow and Water Transfer and all proceeds thereof, all insurance claims for stolen property and all proceeds thereof, all causes of actions and claims (whether asserted now or after the Petition Date) under the Debtors' existing directors and officers insurance policies and all insurance or other proceeds thereof; supporting obligations, letters of credit, letter-of-credit rights, investment property, fixtures and real property, and all cash or non-cash proceeds, products, offspring, |

| | |
|---|---|
| | substitutions and accessions of any of the foregoing, wherever located, whether now or hereafter existing, whether presently owned and hereafter acquired, of every kind and description, and, subject to entry of the Final Order, claims and proceeds of actions of the Debtors or their estates under sections 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code and any avoidance actions under applicable state law and all proceeds thereof. |
| **CASH COLLATERAL:** | As used herein, the term "Cash Collateral" shall mean all "cash collateral" of the Prepetition Agent, the Prepetition Lenders, and the Prepetition A/R Lenders with respect to the Collateral within the meaning of Section 363(a) of the Bankruptcy Code, including, without limitation, the Debtors' cash and cash on deposit in any deposit account or securities account of the Debtors that is subject to a perfected security interest of any the foregoing secured parties. |
| | Neither Cash Collateral nor the proceeds of the DIP Loans may be used by any entity, except by the Debtors' estates and subject to the Budget. For the avoidance of doubt, any inventory, equipment, or other property purchased using Cash Collateral or the proceeds of the DIP Loans may not be used by, or transferred to, any non-Debtor, except to pay expenses under the Budget. |
| **USE OF PROCEEDS:** | The proceeds of the loans made under the DIP Facility (the "DIP Loans") shall be used by the Debtors (i) for working capital purposes and administrative expenses incurred in the Cases in accordance with the Budget referred to herein (subject to permitted variances), (ii) to pay the fees and expenses of the DIP Lenders as provided hereunder and in the DIP Documentation, and (iii) to repay in full all loans and other amounts outstanding under the DIP Loans, Prepetition Credit Agreement and/or Prepetition A/R Agreement. |
| **LIMITATION ON USE OF DIP LOANS AND CASH COLLATERAL:** | Without the DIP Agent's prior written consent, acting at the direction of the DIP Lenders, the proceeds of the DIP Loans and Cash Collateral shall be used by the Company strictly in accordance with the Budget and subject to the Budget covenant (including variances) described herein; provided that in no event shall the DIP Loans, Cash Collateral, Collateral (as defined herein), or Carve-Out be used for any of the following purposes: |
| | • object to or contest the validity or enforceability of the DIP Order, the Cash Collateral Order, or any obligations outstanding under the DIP Documentation, the Prepetition Credit Agreement, or Prepetition A/R Agreement; provided, that a creditor, or the official committee of unsecured creditors, if appointed in these Cases, may expend up to $20,000 for the fees and expenses incurred in connection with the investigation of (but not litigation, objection, or |

| | |
|---|---|
| | any challenge to) any prepetition secured claims and liens under the Prepetition Credit Agreement or Prepetition A/R Agreement (provided, however, that any such investigation shall be initiated and completed and any proceeding to object to or challenge any claims, security interests, or liens of the Prepetition Lenders or Prepetition A/R Lenders shall be commenced no later than sixty (60) days after the Petition Date (the "Challenge Deadline"); |
| | • assert or prosecute any claim or cause of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, or Prepetition A/R Lenders, other than to enforce the terms of the DIP Facility or the DIP Order; |
| | • seek to modify any of the rights granted under the DIP Order or the Cash Collateral Order to the DIP Agent, DIP Lenders, the Prepetition Agent, the Prepetition Lenders, or Prepetition A/R Lenders; |
| | • make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Budget covenant and, with respect to the payment of any prepetition claim or non-ordinary course administrative claim, separately approved by the Bankruptcy Court upon adequate notice to the DIP Agent on behalf of the DIP Lenders; |
| | • object to, contest, delay, prevent or interfere with in any way with the exercise of rights and remedies by the DIP Agent and the DIP Lenders with respect to the Collateral once an Event of Default has occurred (except that Company may contest or dispute whether an Event of Default has occurred and the Company shall be entitled to any notice provisions provided in the DIP Order); or |
| | • except as expressly provided or permitted hereunder or in the Budget, make any payment or distribution to any non-Debtor affiliate, equity holder, or insider of any Debtor outside of the ordinary course of business; provided that in no event shall any management, advisory, consulting or similar fees be paid to or for the benefit of any Debtor affiliate, equity holder, or insider. |
| **ADEQUATE PROTECTION:** | **Adequate Protection Liens**.  As adequate protection of the interests of the Prepetition Agent, the Prepetition Lenders, and Prepetition A/R Lenders in the Collateral, solely to the extent of any diminution in value of such interests pursuant to Sections 361 and 363(e) of the Bankruptcy Code, and subject and subordinate to the Carve-Out and the DIP Liens, the Debtors shall grant to the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, and Prepetition A/R Lenders, valid and perfected replacement security interests in, and liens on the Collateral (the "Adequate Protection Liens").  Subject to the Carve-Out, the Adequate Protection Liens shall be a second priority perfected lien |

upon all of the Collateral that is not otherwise encumbered by a validly perfected, non-avoidable security interest or lien on the Petition Date, junior only to the DIP Liens.

**Adequate Protection Claim**. To the extent of a diminution in value (as described above) and subject to the Carve-Out and the DIP Claims, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, and Prepetition A/R Lenders, shall be granted pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in these Cases with respect to the Debtors and any successor cases (the "Adequate Protection Claim").

**Adequate Protection Payments**. The Prepetition Agent shall receive from the Debtors in cash:

• upon entry of the Final Order, immediate payment from the Roll Up of all accrued and unpaid interest through the Petition Date owed under the Prepetition Credit Agreement and Prepetition A/R Agreement; and

• upon entry of the Interim Order, payment from Cash Collateral or DIP Loan within ten (10) business days of receipt of an invoice for all accrued and unpaid fees and disbursements owed to the Prepetition Agent, the Prepetition Lenders, and Prepetition A/R Lenders, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition Agent, the Prepetition Lenders, and Prepetition A/R Lenders arising under the applicable existing loan agreement, including, without limitation, the Prepetition Credit Agreement and Prepetition A/R Agreement, and, in each case, incurred prior to the Petition Date.

**Additional Adequate Protection**.

• <u>Professional Fees</u>. The Debtors are authorized and directed to make payment of reasonable and documented fees and disbursements to the legal, financial and other professionals retained by the Prepetition Agent, the Prepetition Lenders, and Prepetition A/R Lenders in cash[3] within ten (10) business days of receipt of an invoice therefore (or all portions of such invoice to which the Debtors do not have a good faith objection, with the reasonableness of any disputed amounts to be determined forthwith by the Bankruptcy Court), subject to disclosure requirements under local rules and applicable court procedures. No recipient of any such payment shall be required to file any interim or final fee

---

[3] While only an estimate, the Professional fees of the Lenders and DIP Lenders are roughly estimated to be $70,000 for Jackson Walker and $225,000 for Arent Fox.  These fees are to be paid from the Roll Up, not the New Money Loan.

| | |
|---|---|
| | application with the Bankruptcy Court or otherwise seek bankruptcy court approval of any such payments.<br><br>• <u>Maintenance of the Collateral</u>. The Debtors shall maintain and insure the Collateral on commercially reasonable terms, consistent with past practice and as required in the Prepetition Credit Agreement or the Prepetition A/R Agreement. |
| **INTEREST RATE:** | Interest on the DIP Loans shall be payable monthly in arrears in cash.<br><br>The outstanding principal amount of all DIP Loans shall bear interest rate equal to the existing rate under the Prepetition Credit Agreement, which is 13.75%.<br><br>Default Rate: 2.00% additional per annum interest payable on demand in cash. |
| **FEES:** | **Transaction Fee**: 2.5% on the New Money Loan payable on the earlier of (i) the closing of a sale of all or substantially all of the assets of the Company; and (ii) the effective date of a chapter 11 plan confirmed in the Cases. |
| **MATURITY:** | All loans are to be repaid in full at the earliest of (i) the forty-fifth (45th) day following the Petition Date if, as of such date, the Bankruptcy Court shall not have entered the Final Order, (ii) six (6) months following the Petition Date, (iii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iv) the date of consummation of a sale of all or substantially all of the assets or stock of the Companies under section 363 of the Bankruptcy Code (a "363 Sale"), and (v) the termination by the DIP Agent or DIP Lenders upon an Event of Default (any such date, the "Maturity").  Unless otherwise agreed to by the Lender, any confirmation order entered in these Cases must provide for the repayment in full of the DIP Facility on or before the effective date of the Plan and shall not discharge or otherwise affect in any way the joint and several obligations of the Debtors to the Lender under the DIP Facility. |
| **MANDATORY PREPAYMENTS:** | The DIP Documentation shall include the mandatory prepayment provisions that are substantially the same as those set forth in the Prepetition Credit Agreement or the Prepetition A/R Agreement, modified as necessary to reflect the commencement of the Cases, and such other matters as the DIP Agent shall reasonably require in the DIP Documentation (including, without limitation, an application acceptable to the DIP Agent of the proceeds of Collateral (as defined herein) from the sale of all or any material portion of the assets of the Company). |
| **REPRESENTATIONS AND WARRANTIES:** | The DIP Documentation shall include representations and warranties that are substantially the same as those set forth in the |

| | |
|---|---|
| | Prepetition Credit Agreement (modified as necessary to reflect the commencement of the Cases), plus those that are customary in DIP Loans of this type and such other matters as the DIP Agent, the DIP Lenders and their advisors shall reasonably require in the DIP Documentation, including, without limitation, that the Debtors have not failed to disclose any material assumptions with respect to the Budget and that the Budget was prepared by the Debtors in good faith based on assumptions believed by the Debtors and their advisors to be reasonable. |
| **CONDITIONS PRECEDENT:** | The DIP Documentation shall include customary closing conditions, including, without limitation, entry of the Interim Order, as well as the following orders: Joint administration,  Fee procedures, Notice procedures, Claims/Noticing Agent, Asset Sale procedures, DIP/Cash Collateral, application to employ CRO, application to employ McKool, Cash Management System

• Material "first day orders" of the Debtors shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders, including, without limitation, the following: Joint administration,  Fee procedures, Notice procedures, Claims/Noticing Agent, Asset Sale procedures, DIP/Cash Collateral, application to employ CRO, application to employ McKool, Cash Management System

• The DIP Agent, the DIP Lenders and their advisors shall have an opportunity to review and provide comments on all pleadings related to or otherwise referencing the DIP Loans, the Prepetition Credit Agreement, or the Prepetition A/R Agreement proposed to be filed by the Debtors in advance (at least 48 hours) of filing.

• Payment of all fees and expenses owed to the DIP Agent and the DIP Lenders under the DIP Documentation.

• With respect to the DIP Facility for the period covering Phase 2 – Plan, following the Sale Closing and before entry into the PSA (defined below), the Debtors shall provide an updated budget for the period covering Phase 2 – Plan, satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion. |
| **COVENANTS:** | The DIP Documentation shall include affirmative and negative covenants that are substantially the same as those set forth in the Prepetition Credit Agreement or Prepetition A/R Agreement (modified as necessary to reflect the commencement of the Cases), plus those that are customary for DIP loans of this type and with such baskets and carve-outs as may be agreed in the DIP Documentation, and such other covenants as the DIP Agent, the DIP Lenders and their advisors shall reasonably require in the DIP Documentation, including, without limitation, the following, as |

well as the Budget covenant:

**Affirmative Covenants.**

(a) delivery to the DIP Agent (for distribution to the DIP Lenders) as soon as practicable in advance (at least 48 hours) of filing with the Bankruptcy Court the proposed Interim Order, the Final Order and pleadings proposed to be filed in the Bankruptcy Court seeking approval of the DIP Loan (which must be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors), any plan of reorganization or liquidation, and any disclosure statement related to such plan;

(b) compliance with milestones set forth herein (the "Milestones"); and

(c) access to all information, documents and communications related to or otherwise referencing the Company's claims or causes of action against any third party, including, without limitation, claims or causes of action against the Debtors' directors and officers, as soon as practicable in advance of the filing and thereafter on a rolling basis.

(d) access to all information, documents and communications related to or otherwise referencing the Company's net operating losses ("NOL") as soon as practicable in advance of the filing and thereafter on a rolling basis.

(e) access to information (including historical information) and personnel, including, without limitation, bi-weekly (every other week) scheduled meetings, as mutually agreed, with the Company's senior management and the Chief Restructuring Officer, Chief Financial Officer, or such other officer of the Company with similar responsibility, and other company advisors, which meetings shall include reports with respect to any asset sales, account receivables, net operating losses, location of equipment and other matters reasonably requested by the DIP Agent, the DIP Lenders and their advisors.

**Negative Covenants.**

(a) not creating or permitting to exist any liens or encumbrances on any Collateral, other than liens securing the DIP Facility, any security interests and liens of the Prepetition Lenders and Prepetition A/R Lenders, and any permitted liens (which liens shall include scheduled liens in existence on the Petition Date to the extent subordinated pursuant to the DIP Order and liens granted in connection with adequate protection granted to Prepetition Lenders

| | |
|---|---|
| | and Prepetition A/R Lenders by the Debtors) and other liens described in "Priority/Security" above;<br><br>(b) not creating or permitting to exist any other super-priority claim which is *pari passu* with or senior to the claims of the DIP Lenders under the DIP Facility, except for the Carve-Out;<br><br>(c) not prepaying any pre-petition indebtedness, except as expressly provided for under the Term Sheet, in the Budget, or pursuant to "first day" or other orders of the Bankruptcy Court entered upon pleadings in form and substance reasonably satisfactory to the DIP Lenders; and<br><br>(d) not asserting any right of subrogation or contribution against any other credit party until all borrowings under the DIP Facility are paid in full and the Commitments are terminated. |
| **BUDGET COVENANT:** | Prior to the Petition Date, the Company shall deliver to the DIP Agent a 13-week budget commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Company's and any of its subsidiaries' consolidated projected receipts and disbursements for such 13-week period, and such budget shall be in form and substance reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors (such budget, as supplemented in the manner described below, the "Budget").<br><br>The Company shall deliver to the DIP Agent (for distribution to the DIP Lenders) a report (the "Budget Report"), delivered on Wednesday of each week commencing with the second full week after the Petition Date, showing actual receipts and disbursement through and including the immediately preceding week and explaining variances with respect to disbursements from the Budget that in the aggregate are an amount that is the greater of (i) 10% and (ii) $10,000 for all disbursements in the Budget. Every two weeks, beginning on the Wednesday that is two weeks following the Petition Date, the Company shall deliver to the DIP Agent (for distribution to the DIP Lenders) supplements to the Budget showing projected receipts and disbursements for the subsequent 13 week period.<br><br>Beginning on the Wednesday that is two weeks following the Petition Date, and measured weekly thereafter, the Company shall not permit the actual total disbursements (excluding any disbursements that are or would be reimbursable by a liquidator) to exceed, on a trailing two-week basis, 105% of the total disbursements set forth in the Budget for such period, except as agreed by the DIP Agent in writing.<br><br>Within 7 days before the auction, the Debtors shall deliver to the DIP Agent (for distribution to the DIP Lenders) a budget that |

| | contemplates a liquidation of the Debtors' assets, including, without limitation, inventory, intellectual property, and equipment, and is in a form reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors (the "Liquidation Budget"). |
|---|---|
| **SALE/AUCTION PROCESS:** | The Debtors shall only propose bidding, auction and sale procedures ("Auction Procedures") that (a) include the right of the DIP Agent on behalf of the DIP Lenders to credit bid in connection with any such sale(s) and (b) require all proceeds of such sale(s) to be immediately applied directly and indefeasibly to the obligations owing to the DIP Agent and DIP Lenders.<br><br>The Auction Procedures and the auction procedures order must be in form and substance reasonably acceptable to the DIP Agent, the DIP Lenders and their advisors and may not be amended or otherwise modified in a material manner adverse to the DIP Agent and the DIP Lenders without the consent of the DIP Lenders, such consent not to be unreasonably withheld. |
| **506(c) WAIVER:** | Subject to entry of the Final Order, the Collateral shall not be subject to assessment pursuant to section 506(c) of the Bankruptcy Code. |
| **EVENTS OF DEFAULT:** | The DIP Facility shall be subject to the events of default set forth in the Prepetition Credit Agreement and/or Prepetition A/R Agreement, modified as necessary to refer to the DIP Facility and to reflect the commencement of the Cases (without giving effect to any grace periods provided thereunder), in addition to the following additional events of default (each an "Event of Default"):<br><br>• Debtors' failure to meet any of the Milestones;<br><br>• Debtors' failure to obtain entry of the Interim Order by the 5th business day following the Petition Date;<br><br>• Debtors' failure to obtain entry of the Final Order by the 45th day following the Petition Date;<br><br>• Debtors' failure to comply with the terms of the Interim Order or the Final Order;<br><br>• Debtors' failure to comply with the Budget (subject to any permitted variances (as described herein));<br><br>• Debtors' failure to provide an updated budget, following the auction and/or sale closing and before entry into the PSA (defined below), for the period covering Phase 2 – Plan, satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion;<br><br>• failure of the Debtors to perform (or to cause the performance of, as applicable), any term, provision, condition, covenant, or |

obligation under any DIP Documentation and such failure not being remedied within five (5) business days after receipt of written notice of the failure; provided that the foregoing grace period shall not apply to (a) entry of a Final Order and (b) failure to meet any of the Milestones, neither of which, for the avoidance of doubt, shall be subject to any grace period;

• without the consent of the DIP Agent and the DIP Lenders, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Code approving) adequate protection to any prepetition agent or lender that is inconsistent with this Term Sheet or the DIP Order;

• the filing of any motion by the Debtors seeking to obtain credit or incur indebtedness, or the obtaining of credit and incurrence of indebtedness, by any Debtor that is: (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage, or other lien in favor of the DIP Agent described in this Term Sheet, or (ii) entitled to administrative priority status which is equal or senior to the DIP Claims (other than the Carve-Out) described in this Term Sheet;

• the filing or commencement of any action or proceeding by the Debtors (or any third party with the Debtors' assistance or support) against the Prepetition Agent, the Prepetition Lenders, the Prepetition A/R Lenders, the DIP Agent, or the DIP Lenders by or on behalf of the Company or any of the Company's affiliates or any of their respective shareholders or agents;

• in violation of the Interim Order or Final Order (which must contain 506(c) waivers) the filing or commencement of any action or proceeding for authority to recover by any person from the Collateral or any adequate protection liens granted with respect thereto for any costs of preservation or disposition thereof under section 506(c) of the Bankruptcy Code or authorizing the use of Cash Collateral without consent in writing by the DIP Agent and each of the DIP Lenders.

• institution or support of any judicial proceeding by the Debtors seeking to challenge the validity of any portion of the DIP Documentation, the DIP Loans, the Prepetition Credit Agreement and/or Prepetition A/R Agreement, and the related obligations, or the applicability or enforceability of same, or which seeks to void, limit, subordinate or otherwise adversely affect any security interest or lien created by or in relation to the DIP Documentation, the Prepetition Credit Agreement, or Prepetition A/R Agreement, or any payment pursuant thereto;

• any lien or security interest purported to be created under the DIP

| | |
|---|---|
| | Documentation, the Prepetition Credit Agreement, or Prepetition A/R Agreement shall cease to be, or shall be asserted by the Debtors not to be, a valid and perfected lien on or security interest in any of the Collateral, with the priority set forth in this Term Sheet and in the related loan documents; |
| | • entry of one or more orders by the Court granting relief from or modifying the automatic stay to allow any one or more creditors to execute upon or enforce liens on or security interests in any assets of the Debtors (other than with respect to those Debtors for which the DIP Agent and the DIP Lenders provide prior written consent to such relief); |
| | • a breach by the Debtors of any of their respective material post-petition obligations under the DIP Facility and/or DIP Documentation, including, without limitation, any obligations arising under any post-petition letter of credit facility; |
| | • reversal, vacatur, amendment or modification (without the consent of the DIP Agent and the DIP Lenders), for a period in excess of five (5) days, of the Interim Order or Final Order; |
| | • dismissal of the Debtors' Cases, conversion of any such Case to a chapter 7 case, or the appointment of a chapter 11 trustee or of an examiner or responsible officer (in any such case with expanded powers relating to operation of the business) and the relevant order therefor shall not be reversed or vacated within ten (10) days; |
| | • unless otherwise approved by the DIP Agent, the entry of an order providing for a change of venue or division with respect to the Cases and such order shall not be reversed or vacated within ten (10) days; |
| | • any material misrepresentation of fact made in writing by the Debtors to the DIP Agent or any DIP Lenders regarding the financial condition of the Debtors, or, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral; or |
| | • failure of the Company to comply with any covenant herein. |
| **REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT:** | On not less than five (5) business days' prior written notice by the DIP Agent to counsel for the Debtors, the Office of the United States Trustee (and counsel to any appointed official committee of unsecured creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), the DIP Agent may (i) declare the DIP Loans to be immediately due and payable, (ii) terminate the Company's ability to access the DIP Account and the DIP Loans and to use Cash Collateral; and/or (iii) exercise all rights and remedies, without further order of or application or motion to the Bankruptcy Court, |

| | |
|---|---|
| | and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code. |
| | The Debtors shall not seek to enjoin, hinder, delay or object to the DIP Agent's exercise of rights and remedies in accordance with the DIP Documentation, and at any proceeding with respect to the DIP Agent's exercise of rights and remedies, the Debtors cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default. |
| **INDEMNITY:** | The Debtors shall indemnify, pay and hold harmless the DIP Agent, the DIP Lenders and their affiliates (and their respective directors, officers, employees, agents, professionals, and advisors) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party) including the expenses incurred by the DIP Agent and the DIP Lenders and in connection with the negotiation, documentation and administration of the DIP Facility (including fees and expenses of counsel and other advisors), and expenses incurred by the DIP Lenders in connection with any default in respect of the DIP Facility and any exercise of remedies in respect thereof. |
| **GOVERNING LAW:** | All DIP Documentation in connection with the DIP Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such State (without regard to conflict of law principles) except as governed by the Bankruptcy Code. |
| **ASSIGNMENTS, PARTICIPATIONS, ETC.:** | The DIP Lenders shall be permitted to sell or assign its rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Company. The DIP Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Company. |
| **OUT-OF-POCKET EXPENSES:** | All fees, including legal and other professional fees (including any financial advisor to be retained by the DIP Agent or the DIP Lenders), and all reasonable out-of-pocket expenses associated with the transaction are to be paid by the Company without the need for the filing of any applications with the Bankruptcy Court. |
| | All borrowings by the Borrowers, all costs, fees and expenses of the DIP Agent or the DIP Lenders (including the fees and expenses of their professionals), and all other obligations owed to the DIP Agent or the DIP Lenders shall be charged to the DIP Account to be established under the DIP Facility, unless such costs, fees, expenses and other obligations have been paid by the Company on |

| | |
|---|---|
| | a current basis. |
| **MILESTONES:** | **Phase 1 - Sale**: |

| DATE | ACTION |
|---|---|
| Petition Date | • (unless another timeframe is agreed to in writing by the DIP Lenders) Motion filed to authorize auction and related procedures for liquidation of the Debtors' assets, including intellectual property and owned and leased equipment and other property |
| No later than 7 days following the Petition Date | • Motion filed to engage an auctioneer(s) to market and liquidate the Debtors' assets, including intellectual property and owned and leased equipment and other property |
| No later than 21 days following the Petition Date | • Order approving auction procedures<br><br>• Order approving retention of an auctioneer(s) |
| No later than 60 days following the Petition Date | Auction to be held |
| No later than 70 days following the Petition Date | Auction results approved by the Bankruptcy Court |

**Phase 2 – Plan**: Following the Sale Closing and before entry into the PSA (defined below), the Debtors shall provide an updated budget for the period covering Phase 2 – Plan, satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion.

| DATE | ACTION |
|---|---|
| [_____] | Debtors enter into a plan support agreement ("PSA") with the DIP Agent and DIP Lenders that is satisfactory in form and substance to the DIP Agent and DIP Lenders in their |

| | | sole and absolute discretion |
|---|---|---|
| | [_____] | • Motion filed to approve a disclosure statement ("DS") and a chapter 11 plan ("Plan") based on, and incorporating all the material terms of, the PSA. Both the Plan and DS shall be satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion |
| | [_____] | Order approving DS and related confirmation and solicitation procedures satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion |
| | [_____] | Order confirming the Plan |

## **BASIS FOR RELIEF**

### I.      **Standards for Approval under Sections 364(c) and 364(d)(1).**

33.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

34.      In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain post-petition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

authorize the obtaining of credit or the incurring of debt secured by a
senior or equal lien on property of the estate that is subject to a lien only
if-

(A) the [debtor] is unable to obtain credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on
the property of the  estate on which such senior or equal lien is proposed
to be granted.

11 U.S.C. § 364(d)(1).

35.     In evaluating proposed post-petition financing under sections 364(c) and

364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider

various factors including whether:

   a.      unencumbered credit or alternative financing without superpriority
           status is available to the debtor;

   b.      the credit transactions are necessary to preserve assets of the estate;

   c.      the terms of the credit agreement are fair, reasonable, and
           adequate;

   d.      the proposed financing agreement was negotiated in good faith and
           at arm's length and entry thereto is an exercise of sound and
           reasonable business judgment and in the best interest of the
           debtors' estate and their creditors; and

   e.      the proposed financing agreement adequately protects prepetition
           secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group*, Inc., 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

36.     Section 364 of the Bankruptcy Code also allows for post-petition financing

secured by a priming lien.  Section 364(d)(1) provides that the court, after notice and a hearing,

may authorize the obtaining of credit or the incurring of debt if:

32

> (i)    the trustee is unable to obtain such credit otherwise; and
>
> (ii)   there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

37.    For the reasons discussed below, the Debtors satisfy the standards required to access post-petition financing on a superpriority claim and priming lien basis under Sections 364(c) and 364(d) of the Bankruptcy Code.

### A.    The Debtors Cannot Obtain Financing on More Favorable Terms.

38.    In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

39.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

40.     As set forth above and in the First Day Declaration, the Debtors, with the assistance of their financial and other advisors, after conducting marketing efforts and carefully reviewing the various alternatives, determined that the DIP Facility is the best available option for, among other things, the following reasons: (i) the DIP Facility (after being revised by extensive negotiations and concessions) offered better overall terms when compared to the overall terms of the considered alternatives; (ii) the DIP Facility had the highest certainty of closing given that, among other things, the Debtors were already indebted to such lenders, which incentivized such lenders to provide financing to, among other things, protect their economic interests; (iii) the DIP Agent and the DIP Lenders have a substantial base of knowledge with respect to the Debtors' business, their capital structure and the Pre-Petition Collateral, which knowledge ultimately saved the estate diligence-related time and expense.

**B.      The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

41.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See *CFTC . v. Weintraub,* 471 U.S. 343, 352 (1985); *Louisiana World Exposition v. Fed. Ins. Co*., 858 F.2d 233 (5th Cir 1988).  The DIP Facility, if approved, will provide working capital critical to funding the Debtors' remaining operations.  Without access to the DIP Facility, the Debtors would be forced to cease operating, which would result in immediate and irreparable harm to their businesses and assets by depleting going concern value. Because the Debtors' available and projected liquidity is insufficient to fund a plan, the credit provided under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

C. **Terms of the DIP Facility are Fair, Reasonable and Adequate under the Circumstances.**

42.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

43.     Given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the best interests of the Debtors, their estates and their creditors. The DIP Facility Documents were negotiated extensively by the Debtors and the DIP Lenders, in good faith and at arm's length as required by Section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.

D. **Repayment of the Pre-Petition Senior Loan Obligations Should Be Approved.**

44.     As a condition to providing the Debtors with post-petition funding the Debtors desperately need to stay in business and preserve enterprise value for the benefit of all parties in interest, and as an incentive to providing the DIP Facility, the DIP Lenders, along with the Prepetition Agent, insisted that the proceeds of DIP Term Facility will be used to Roll-Up the Prepetition Secured Obligations under the Prepetition Loan Documents.  The Roll-Up Loan to

repay the Prepetition Secured Obligations is justified because without such payments and treatment, the Debtors would likely find themselves in a prolonged and expensive priming fight with the Prepetition Lenders.  The Debtors also would not have been able to secure the debtor-in-possession financing needed to stabilize their business without such condition.   Thus, the Debtors, in their business judgment, think it is best to avoid such litigation so that it can focus its time, resources, and energy on restructuring its business.  As noted above, no other outside lender was willing to provide a debtor-in-possession financing arrangement that would be more favorable to the Debtors.

45.     Importantly, this accommodation ultimately inures to the benefit of all of the Debtors' stakeholders because it gives the Debtors the liquidity they need to proceed under chapter 11 with a clear trajectory rather than under a free-fall scenario.  The Debtors will use the proceeds of the DIP Facility to finance their cases and continue expeditiously towards a plan of reorganization.   Equally important is the fact that the proposed Interim order provides that interested parties have an opportunity to investigate and challenge the claims and liens in respect of the Prepetition Secured Obligations, within a defined challenge period.

46.     Finally, the rights of parties in interest to challenge the Prepetition First Lien Secured Parties' claims and liens are not prejudiced by the Roll-Up because the Interim Order preserves the rights of identified parties to object to and challenge the amount, validity, enforceability, perfection or priority of the Pre-Petition Senior Loan Obligations during a certain period as set forth therein, and the Roll-Up is qualified in its entirety by the rights of those parties to bring a Challenge Proceeding and the recharacterization or reapplication by the Court of any transfers deemed improper because of such a Challenge Proceeding.

47.     Roll-Ups are a common feature in debtor-in-possession financings, and courts have approved full roll-ups in a variety of cases, and in certain cases courts have permitted rollups of prepetition debt on the first day of the case.  *See, e.g., In re Laboratory Partners, Inc*., Case No. 13-12769 (Bankr. D. Del. Oct. 29, 2013) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Southern Air Holdings, Inc*., Case No. 12-12690 (Bankr. D. Del. Oct. 1, 2012) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Appleseed's Intermediate Holdings LLC*, et al., Case No. 11-0160 (Bankr. D. Del. Jan. 20, 2011) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Hayes Lemmerz Int'l, Inc*., Case No. 09-11655 (Bankr. D. Del. May 14, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Source Interlink Cos. Inc*., Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Dayton Superior Corp*., Case No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Aleris Int'l*, Inc., Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Pacific Energy Resources, Ltd*., Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Foamex International Inc*., Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing debtor-in-possession financing that included full roll-up under the interim order); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Holley Performance Products Inc*., No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order).

*See also In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012) (authorizing the refinancing of $11,500,000 of existing letter of credit obligations); *In re Velo Holdings, Inc.*, Case No. 12-11384 (Bankr. S.D.N.Y. April 2, 2012) (authorizing a dollar-for-dollar refinancing of prepetition obligations up to $20,000,000); *In re Blockbuster, Inc.*, Case No. 10-14997 (Bankr. S.D.N.Y. Sept. 23, 2010) (authorizing the roll up of secured notes of up to $125 million); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Mar. 18, 2009) (authorizing a $86.5 million refinancing revolving credit facility under a $400 million DIP facility); *In re Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) (approving a dollar-for-dollar roll up of $3.25 billion of a prepetition secured debt facility); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009) (approving the payment of $79.5 million of prepetition secured indebtedness).

48.    This case is similar insofar as the Roll-Up takes out valid senior prepetition lenders in a manner that permits investigation by a creditor or the official committee of unsecured creditors, if appointed in these cases, of the prepetition secured loans, claims and liens under the Prepetition Loan Documents, and, if there is a proper basis, an opportunity to challenge the prepetition secured claims and liens, as well as the Roll-Up Loan.  Moreover, the Debtors have no cash or alternative financing, except for the funds provided to the Debtors by the prepetition lenders before the filing and the DIP Facility provided by the DIP Lenders.

E.    **Entry into the DIP Facility Documents Reflects the Debtors' Reasonable Business Judgment.**

49.    A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent

business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

50.      Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

51.      For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is the exercise of the Debtors' reasonable business judgment.

### F.      Adequate Protection, DIP Liens and Replacement Liens on Avoidance Actions are Appropriate, Reasonable and Justified under the Circumstances.

52.      One of the key conditions by the DIP Lenders to providing financing under the DIP Facility is that the DIIP Lender has a lien on all claims and proceeds of actions of the Debtors or their estates under sections 502, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code and all avoidance actions under applicable state law and all proceeds

thereof ("Avoidance Actions").  In light of the Debtors' financial condition, limited operations, the fact that most vendors and creditors have not been paid in weeks, and inability to generate sufficient post-petition collateral to cover for any diminution in value of prepetition liens, the Prepetition Lenders are each entitled to receive and should be granted adequate protection in the manner set forth in this Interim Order and the DIP Facility Term Sheet pursuant to sections 361, 363 and 364 of the Bankruptcy Code for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the Debtors' use, sale, or lease of such collateral, (ii) market value decline of such collateral, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the subordination to the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

### G.  Section 506(c) Waiver Should Be Approved.

53.    The Court should approve the Debtors' waiver in the Interim Order of any right to surcharge under section 506(c). Such waivers and provisions are standard and customary under financings between sophisticated parties.   As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-In-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000), *vacated and remanded on other grounds*, 2001 WL 36381917 (1st Cir. BAP March 11, 2001); *see also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1985) (noting that the debtor had waiver section 506(c) rights in obtaining debtor-in-possession financing).

54.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the DIP Facility and the Carve-Out.  In particular, the Debtors have waived the uncertainty of surcharge rights in exchange for immediate and necessary liquidity from the DIP Lenders and the valuable and predictable rights granted to the Debtors' estates' professionals and other interested parties under the Carve-Out. *See In re Lunan Family Restaurants Ltd., P'Ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]").  For these reasons, the section 506(c) waiver is appropriate and should be approved under the circumstances.

      **H.**       **<u>Proposed Adequate Protection Provisions are Appropriate, Reasonable and Justified</u>.**

55.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal

citations omitted).   When priming of liens is sought under section 364(d), the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

56.     Courts have considered the preservation and enhancement of collateral to be a critical component of adequate protection.  In determining the sufficiency of adequate protection, the Third Circuit noted, in *In re Mt. Olive Hospitality, LLC*, that "a number of bankruptcy courts have looked favorably upon the use of cash collateral where its use served to enhance the secured creditor's position through the generation of additional value."  Civ. No. 13-3395, 2014 U.S. Dist. LEXIS 42886, at *16-17 (Mar. 31, 2014) (citing *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993) ("the concept [of adequate protection] consists of stability in collateral value rather than any particular level of value") (citation omitted); *In re T.H.B. Corp.*, 85 B.R. 192, 193-95 (Bankr. D. Mass. 1988) (stating that part of the Bank's adequate protection was the "fact that the proceeds of accounts receivables are being used by the Debtor to generate new inventory and accounts", and that "[t]he use of the Bank's cash collateral . . . is an element of the Bank's adequate protection"); *Bankers Life Ins. Co. v. Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981) (holding similarly) The Debtors will make a similar showing.

57.     As shown in the Cross Affidavit in support of the first day motions, adequate protection is necessary because the Debtors' operations have ceased.  Future revenue will not make up for the expenditures.  As shown by the budget, the expenditures necessarily decrease the Lenders' collateral position.  The Cross Affidavit explains that, absent a sale that uses cash collateral to market the assets, the Debtors will not realize the same value at auction for their assets and the creditors will be harmed.

58.     The proposed adequate protection provided to the Pre-Petition Secured Parties is comprised of, among other things, (i) continuing valid, binding, enforceable and automatically and properly perfected post-petition security interests in and liens on the DIP Collateral (the "Adequate Protection Liens") which such Adequate Protection Liens are junior only to the Carve-Out, and the DIP Liens and (ii) allowed superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") that are subject only to the repayment in full in cash of the Carve-Out and the DIP Superpriority Claim (and, with respect to the Junior Adequate Protection Superpriority Claim, subject also to the repayment of the Senior Adequate Protection Superpriority Claim).

59.     The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral is fair and reasonable. Further, in reliance upon, among other things, such adequate protection, the Pre-Petition Senior Secured Parties have consented to the priming of Pre-Petition Senior Loan Obligations.  The consent of the Pre-Petition Senior Secured Parties permits the Debtors to avoid potentially time consuming and unpredictable priming litigation.  The Pre-Petition Senior Lenders' consent to the priming of their liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining post-petition financing.  And importantly, the proposed adequate protection shall only be provided to the extent there is any diminution in value to the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral.  Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

**I.      Approval of Cash Collateral Use is Reasonable and Necessary.**

60.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the

secured party.  The Debtors have been able to secure an agreement from the Lender on a consensual Interim Order.  The Interim Order will allow the Debtors to use the Collateral, including the DIP Collateral, subject to an agreed upon budget.

61.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Considered in the context of the Debtors' current and projected cash position, the proposed Adequate Protection—which the DIP Lender has agreed to—is sufficient to protect the Lender from any diminution in value to the Prepetition Collateral.

**J.      Failure to Obtain the Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm.**

62.     Pursuant to Bankruptcy Rule 4001(b)(2), the Court may conduct an expedited preliminary hearing on this Motion—sooner than 15 days after this Motion's filing—and authorize the use of Cash Collateral as "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  FED R. BANK. P. 4001(b)(2).

63.     The Debtors have an immediate post-petition need for the use of cash provided by the DIP Loan and use of Cash Collateral.  Cash is essential for the Debtors to maintain the value of their estates during the pendency of the Cases.  The Debtors will use cash to, among other things, procure goods and services from vendors, pay their employee/officer, pay for insurance, and satisfy other needs during the cases.  Without the ability to use Cash Collateral for such purposes, the Debtors will not be able to participate in the plan and sale process, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors ability to finance their operations and the availability to the Debtors of sufficient liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

64.     The Debtors, therefore, seek immediate authority to use the Cash Collateral as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

**II.     The Automatic Stay Should be Modified on a Limited Basis.**

65.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Lender to file any financing statements, notice of liens, or similar instruments in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Lender to exercise, upon the occurrence of the Termination Date, certain rights and remedies provided for in the Interim Order.

66.     Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Cases.  *See, e.g., In re ATP Oil and Gas* (Bankr. S.D. Tex.); *In re CDX Gas* (Bankr. S. D. Tex.).

<u>**REQUEST FOR FINAL HEARING**</u>

67.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**SATISFACTION OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

68.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**NOTICE**

1.     Notice of this Motion will be provided by overnight delivery and/or e-mail or facsimile to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 20 largest consolidated unsecured creditors of the Debtors; (d) the DIP Lender(s); (e) all known shareholders holding over 5% of a class of equity interests in any of the Debtors; (f) the Securities and Exchange Commission; and (g) the Internal Revenue Service.  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

**NO PRIOR REQUEST**

69.     No prior motion for the relief requested herein has been made to this or any other court.

**CERTIFICATE OF NECESSITY OF
REQUEST FOR EMERGENCY HEARING**

70.     Without the DIP Facility there is no bankruptcy.

71.     If the Debtors are not permitted to use Cash Collateral, they will be forced to halt their efforts to sell, which will result in loss of the value of the business and a reduction in the value of the Debtors' enterprise and estates' assets to the detriment of the Debtors' creditors. There would not be a successful Chapter 11 proceeding if the current motion is not considered on an expedited basis.

72.     The Debtors estimate that approximately one hour will be necessary for a hearing on this Motion and that approximately two hours may be required for a final hearing.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: September 18, 2015.

MCKOOL SMITH, P.C.

By:    /s/ Hugh M. Ray, III
         Hugh M. Ray, III
         State Bar No. 24004246
         Christopher D. Johnson
         State Bar No. 24012913
         Benjamin W. Hugon
         State Bar No. 24078702
         600 Travis, Suite 7000
         Houston, Texas 77002
         Tel: 713-485-7300
         Fax: 713-485-7344

*Proposed Counsel for the Debtors-in-Possession*