

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

ENTERED
09/23/2015

| | | |
|---|---|---|
| In re: | § | |
| HII TECHNOLOGIES, INC. | § | Chapter 11 |
| Debtor | § | Case No. 15-60070 (DRJ) |
| | § | (**Jointly Administered** |

**INTERIM ORDER APPROVING THE DEBTORS' EMERGENCY MOTION FOR
ENTRY OF INTERIM ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING; (B) AUTHORIZING USE OF CASH COLLATERAL;
AND (C) GRANTING ADEQUATE PROTECTION TO THE DIP LENDERSS**

Upon the motion, dated September 18, 2015 (the "Motion"),[1] of HII Technologies, Inc. ("HII") and its above-captioned affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned jointly administered bankruptcy cases (the "Cases") for interim and final orders under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 2002-1, 4001-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), seeking interim use of cash collateral and postpetition financing of:

a)  authorizing the Debtors, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014, to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and to obtain from McLarty Capital Partners SBIC, L.P., a Delaware limited partnership ("MCP"), as the administrative and collateral agent, and Heartland Bank, an Arkansas state bank ("Heartland") and MCP, as lenders (collectively, the "DIP Lenders") a senior secured superpriority debtor-in-possession term loan facility (the "DIP Facility") with a commitment in an aggregate principal amount of up to $12 Million (the "Commitment"), comprised of (i) an amount up to $500,000 in respect of new money funding (the "New Money Loan"); (ii) a dollar-for-dollar roll-up as Cash Collateral is used by the Debtors, subject to and in accordance with the approved budget (the "Budget"), attached hereto as **Exhibit A**, subject to Permitted Variances (as defined below) based on written consent by MCP as the administrative and collateral agent under the DIP Facility under a collateral agreement acting for the DIP Lenders (the "DIP Agent") from the date of the entry of the interim order (the "Interim Order") until the date of the entry of the final order (the "Final Order", and together with the Interim Order, the "DIP Order"); and (iii) a roll-up in the amount of $11.5 million in respect of outstanding loans and obligations under the Prepetition Credit Agreement and Prepetition A/R Agreement

---

[1]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Term Sheet for Proposed Senior Secured Superpriority DIP Term Loan Facility (the "DIP Facility Term Sheet", annexed hereto as Exhibit A), among each of the Debtors and the DIP Lenders.

(the "Roll-Up Loan") occurring promptly upon the entry of the Final Order, in accordance with the DIP Facility Term Sheet incorporated into the Motion;

b)   authorizing the Debtors to execute and deliver the DIP Facility Term Sheet and to perform such other and further acts as may be necessary and appropriate in connection therewith and, on an interim basis, in accordance with the Budget, to use Cash Collateral and to access the DIP Facility, pursuant to the DIP Facility Term Sheet;

c)   authorizing the Debtors, pursuant to the DIP Facility Term Sheet, to use the DIP Facility, solely in accordance with the Budget", and not otherwise prohibited under the DIP Facility Term Sheet, (i) for working capital purposes and payment of administrative fees, costs and expenses incurred in the Cases; (ii) to pay all principal, interest, fees, expenses and other amounts payable to the DIP Lenders under the DIP Facility as such amounts become due and payable, as provided hereunder and in the DIP Documentation; and (iii) to repay in full all loans, obligations, and other amounts outstanding under the DIP Loans, Prepetition Credit Agreement and/or Prepetition A/R Agreement;

d)   entering orders, first at an interim and then at a final hearing, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, to provide that the obligations of the Debtors to the DIP Lenders under the DIP Facility Term Sheet (the "DIP Obligations") (i) be granted an allowed superpriority administrative expense claim against each Debtor (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtors, including, but not limited to, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 and 1114 of the Bankruptcy Code, subject only to the Carve-Out; (ii) subject only to the Carve-Out, be secured (A) under section 364(d) of the Bankruptcy Code, by valid, fully perfected, unavoidable, priming first-priority security interest in the Collateral (as defined herein); (B) under section 364(c)(2) of the Bankruptcy Code, by valid, fully perfected, unavoidable, first priority, senior security interests in and liens on all of the all of the Collateral; and (C) under section 364(c)(3) of the Bankruptcy Code, by valid, fully perfected, unavoidable, junior priority, security interests in and liens on all of the Debtors' currently owned and after acquired encumbered property (collectively, the "Post-Petition Liens");

e)   granting to the Prepetition Lenders (as defined below), as adequate protection for any diminution in the value of their collateral resulting from the Debtors' use of cash collateral, the priming liens in favor of the DIP Obligations, or otherwise, (i) replacement liens on all collateral, subordinate only to the liens in favor of the DIP Obligations and the Carve-Out, (ii) superpriority administrative expense claims junior only to the superpriority administrative expense claims of the DIP Lenders and subject to the Carve-Out, and (iii) payment of fees and expenses of the Prepetition Agent and Prepetition Lenders, which shall be reimbursed in cash on a

current basis (collectively, "Prepetition Lenders' Replacement Liens and Protections");

f)    authorizing, with respect to the proceeds of the DIP Facility, the refinancing in full, on the Closing Date (as defined below), of the outstanding principal amount of the Pre-Petition Senior Secured Loans;

g)    authorizing (i) the DIP Agent to terminate the funding commitments under the DIP Agreement, and (ii) the DIP Agent to terminate the Debtors' sale, use, or lease of Cash Collateral, each upon the occurrence and continuance of an Event of Default (as defined in the DIP Facility) on the terms specified herein;

h)    modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and the Interim Order;

i)    waiving any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Order;

j)    scheduling an emergency interim hearing (the "Interim Hearing") on this Motion for the Court to consider entry of the Interim Order; and

k)    scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on this Motion for a date that is before the 45th day after the Petition Date (as defined below) to consider entry of the Final Order authorizing the Debtors to use Cash Collateral and to obtain, on a final basis, the DIP Facility, pursuant to the DIP Facility Term Sheet.

The Debtors having requested in the Motion, as supported by the declaration of Loretta Cross (the "First Day Declaration"), that pending the Final Hearing on the Motion, a hearing be scheduled on an expedited basis to consider the entry of the Interim Order; and notice having been provided in accordance with the Bankruptcy Rules and Local Rules, and no other objection having been timely filed.

NOW, THEREFORE, upon the Motion and after due deliberation and good and sufficient cause appearing therefor, the Court hereby makes the following Findings of Fact and Conclusions of Law:

Based upon the record presented to the Court, it appears that:

A.    <u>Filing</u>.  On September 18, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for reorganization in this Court under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108.  No trustee, examiner or official committee of unsecured creditors has been appointed in these Cases.

3

B.    <u>Existing Financing</u>.  Pursuant to that certain senior secured credit facility (the "Facility" or "Pre-Petition Senior Loan") entered into on August 12, 2014 by and between the Debtors and Heartland Bank as Agent, consisting of two parts: (a) that certain Credit Agreement dated as of August 12, 2014, as amended and modified (the "Prepetition Credit Agreement"), by and between HII Technologies, Inc., a Delaware corporation, Apache Energy Services, LLC, a Nevada limited liability company, Aqua Handling of Texas, LLC, a Texas limited liability company, Hamilton Investment Group, an Oklahoma corporation, KMHVC, Inc n/k/a Sage Power Solutions, Inc., a Texas corporation (collectively, the "Borrowers"), and Heartland Bank, an Arkansas state bank ("Heartland"), as administrative agent (the "Prepetition Agent"), and McLarty Capital Partners SBIC, L.P., a Delaware limited partnership ("MCP"), together with Heartland, as lenders  (collectively, the "Prepetition Term Lenders"); and (b) that certain Account Purchase Agreement dated as of August 12, 2014, as amended (the "Prepetition A/R Agreement" and together with the Prepetition Credit Agreement, the "Prepetition Loan Documents"), by and between HII Technologies, Inc., a Delaware corporation, Apache Energy Services, LLC, a Nevada limited liability company, Aqua Handling of Texas, LLC, a Texas limited liability company, Hamilton Investment Group, an Oklahoma corporation, KMHVC, Inc, a Texas corporation (collectively, the "A/R Borrowers") and Heartland, as administrative agent, and certain financial institutions and their successors and assigns (collectively, "Prepetition A/R Lenders", and together with the Prepetition Term Lenders, "Prepetition Lenders"), which replaced the Debtors' previous senior secured revolving facility.

C.    The Debtors entered into certain modification and waiver agreement of the Prepetition Credit Agreement with the Prepetition Agent in which the Prepetition Term Lenders waived certain existing defaults, waived default interest, and permitted an equity raise.  Under the Third Modification and Waiver Agreement of the Prepetition Credit Agreement, the interest rate was increased to a non-variable 13.75%, and the principal payment terms were changed to monthly payments of $110,000.  A balloon payment remained due on the August 12, 2017 (the maturity date).  The Debtors were in default under the Prepetition Loan Documents, which were extended by numerous forbearances between July 1, 2015 and the Petition Date.

D.    <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any appointed committee or other non-Debtor party-in-interest with standing, the Debtors hereby admit, acknowledge, agree, and stipulate that:

(i)    as of the Petition Date, the Debtors were truly and justifiably indebted to the Prepetition Lenders and Prepetition Agents, without defense, counterclaim or offset of any kind, in respect of (a) principal plus accrued but unpaid interest, costs, fees and expenses, in the approximate amount of $10,292,897.22 under the Prepetition Credit Agreement; and (b) principal plus accrued but unpaid interest, costs, fees and expenses, in the approximate amount of $890,680.71 under the Prepetition A/R Agreement (collectively, the "Prepetition Secured Claims");

(ii)    pursuant to the Prepetition Loan Documents, the Debtors granted to and/or for the benefit of the Prepetition Lenders, as security for the Prepetition Secured Claims, valid and fully perfected first-priority and continuing pledges, liens and security interests (the "Prepetition Liens") in and upon certain of the

4

Debtors' real and personal property (the "Prepetition Collateral"), as more particularly described in the Prepetition Loan Documents;

(iii)    (a) the Prepetition Secured Claims constitute legal, valid, enforceable, and binding obligations of each of the Debtors (the "Prepetition Secured Obligations"); (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Lenders against each of the Debtors; (e) the Prepetition Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable, and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral; (f) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge, or cause of action against the Prepetition Agent or Prepetition Lenders or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors, and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery;

(iv)    all of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agent and Prepetition Lenders;

(v)    The accounts sold under the Prepetition A/R Agreement are not property of the Debtors or respective estates and remain property of the Prepetition A/R Lenders as set forth on Exhibit "B" to this Order.  The Prepetition A/R Lenders are not subject to the Automatic Stay under 11 U.S.C. §362(a) with relation to the accounts.

(vi)    as a result of the commencement of these Cases, the Debtors are in default of their debts and obligations under the Prepetition Loan Documents.

E.    Need for Additional Postpetition Financing.  The Debtors have a fiduciary duty to protect and maximize their estates' assets and have an immediate need to obtain the DIP Facility. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses until the closing (the "Closing") of the sale of their assets, including, without limitation, inventory, intellectual property, and equipment (the "Sale")

without the DIP Facility.  The ability of the Debtors to pay employees, maintain business relationships with vendors and suppliers, and otherwise finance their operations is essential to the Debtors' continued viability.  Without access to the DIP Facility, the Debtors would be forced to cease operating, which would result in serious, immediate and irreparable harm to the Debtors, their businesses and assets, and the Debtors' estates to by depleting going concern value. Because the Debtors' available and projected liquidity is insufficient, the credit provided under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.  The purpose of the DIP Facility will thus be to preserve, maintain and enhance the going concern value of the Debtors, to allow the Debtors to continue to protect their vendor and business relationships, and to maximize the value of the Debtors' estates' assets.

      F.    <u>No Credit Available on More Favorable Terms</u>.  Given the Debtors' financial condition, financing arrangements, and capital structure, the Debtors do not have sufficient cash collateral to fund their  businesses until Closing and are otherwise unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Financing on a postpetition basis is not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code.  The Debtors are unable to obtain the necessary postpetition financing that they needs on terms more favorable in the aggregate than those provided by the DIP Documentation.  The Debtors, with the assistance of their financial and other advisors, after conducting marketing efforts and carefully reviewing the various alternatives, determined that the DIP Facility is the best available option for, among other things, the following reasons: (i) the DIP Facility, as described in the DIP Facility Term Sheet, after being revised by extensive negotiations and concessions, offered better terms when compared to the terms of the considered alternatives; (ii) the DIP Facility had the highest certainty of closing given that, among other things, the Debtors were already indebted to such lenders, which incentivized such lenders to provide financing to, among other things, protect their economic interests; and (iii) the DIP Agent and the DIP Lenders have a substantial base of knowledge with respect to the Debtors' business, their capital structure and the Prepetition Collateral, which knowledge ultimately saved the estates diligence-related time and expenses.

      G.    <u>Need to Grant Superpriority Administrative Expense Claim and Priming Liens</u>. The Debtors are unable to obtain adequate unsecured credit financing allowable under section 503(b)(1) of the Bankruptcy Code and must grant to the DIP Lenders a Superpriority Administrative Expense Claim as contemplated by section 364(c)(1) of the Bankruptcy Code and liens as contemplated by section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code.  The DIP Lenders has conditioned all loans and advances to be made under the DIP Documentation upon the grant to the DIP Lenders subject only to the Carve-Out: (a) a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of any kind or nature whatsoever specified in sections 503(b) and 507(b) of the Bankruptcy Code and (b) in accordance with section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on and security interests in the Collateral.

H.      DIP Facility.  Pursuant to the DIP Documentation, the DIP Facility shall be in the form of a post-petition senior secured super-priority term loan facility with a commitment in an aggregate principal amount of up to $12 Million (the "Commitment"), comprised of (i) an amount up to $500,000 in respect of new money funding (the "New Money Loan"); (ii) a dollar-for-dollar roll-up as Cash Collateral is used by the Debtors, subject to and in accordance with the Budget, subject to Permitted Variance from the date of the entry of the Interim Order until the date of the entry of the Final Order; and (iii) a roll-up in the amount of $11.5 million in respect of outstanding loans and obligations under the Prepetition Credit Agreement and Prepetition A/R Agreement (the "Roll-Up Loan") occurring promptly upon the entry of the Final Order, in accordance with the DIP Facility Term Sheet, the DIP Documentation, and the Budget.  The New Money Loan is a delayed draw term loan and shall not be a revolving credit facility and therefore shall not be available to be re-borrowed.  The New Money Loan will be funded on a weekly basis beginning on the first Monday after entry of the Interim Order or as otherwise agreed by the DIP Agent in writing.  Every Friday after entry of the Interim Order, the Debtors' CRO shall provide the DIP Lenders with a written request for funding, which shall be consistent with the Budget (the "Funding Request").  The DIP Lender will fund by the following Monday, in accordance with the Budget and the Debtor's Funding Request so long as no Event of Default occurred.  Upon being drawn down after entry of the Interim Order, proceeds of the New Money Loan will be deposited into one or more bank accounts of the Debtors reasonably acceptable to the DIP Agent (each, a "DIP Account"); provided that the DIP Agent shall at all times have a perfected first priority lien thereon as well as sole dominion and control, in either case, pursuant to the DIP Order and a deposit account control agreement to be executed promptly in a form and substance reasonably acceptable to the DIP Agent and the DIP Lenders.  Subject only to the Carve-Out, the DIP Facility shall be at all times senior to and of higher priority than expenses, liens, and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code.  Amounts borrowed under the DIP Facility ("DIP Loans") shall be used by the Debtors solely (i) for working capital purposes and administrative expenses incurred in these Cases in accordance with the Budget through the Maturity Date, (ii) to pay the fees and expenses of the DIP Lenders as provided under this Interim Order, the DIP Facility Term Sheet, and the DIP Documentation, and (iii) to repay in full all loans and other amounts outstanding under the DIP Facility and Prepetition Loan Documents.  The Interest on the DIP Loans shall be payable monthly in arrears in cash.  The outstanding principal amount of all DIP Loans shall bear interest rate equal to the existing rate under the Prepetition Credit Agreement, which is 13.75%.  The default rate shall be 2.00% additional per annum interest payable on demand in cash.  All sale proceeds, cash, hereafter acquired property, proceeds of litigations and insurance policies, account receivable collections, and all other Collateral subject to the DIP Liens shall be applied to reduce the DIP Loans on a weekly basis by the Debtors by the sweeping of the DIP Account.  Any amounts remaining in the DIP Account at the Maturity or earlier termination of the DIP Facility (whether by acceleration or otherwise) shall be applied to reduce the DIP Loans then outstanding (in such order or priority as determined by the DIP Lenders).

I.      Adequate Protection.  The Prepetition Lenders are each entitled to receive and are granted adequate protection in the manner set forth in this Interim Order and the DIP Facility Term Sheet pursuant to sections 361, 363 and 364 of the Bankruptcy Code for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the Debtors' use, sale, or lease of such collateral, (ii)

market value decline of such collateral, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the subordination to the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

J.    Business Judgment and Good Faith.  The terms of the DIP Facility, including as set forth herein, and in the DIP Documents are at least as favorable to the Debtors as those available from alternative sources.  The terms of the DIP Facility, this Interim Order, and the DIP Documentation have been negotiated in good faith and at arm's length between the Debtors and the DIP Lenders, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are fair and reasonable under the circumstances, and are enforceable in accordance with applicable law.  The credit extended to the Debtors by the DIP Lenders under the terms of the DIP Facility shall be deemed to have been extended in "good faith" as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

K.    Need for Approval.  The Debtors have no alternative source of financing to meet their projected obligations, including payroll and other operating expenses, and consequently, it is essential that the Court approve the DIP Facility contemplated hereby.  Consummation of the DIP Facility in accordance with the terms of this Interim Order and the DIP Documentation is therefore in the best interests of the Debtors' estates, and are consistent with the Debtors' exercise of their fiduciary duties, and will result in immediate and irreparable harm if not approved.

L.    Necessity of Entry of this Interim Order.  Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for reorganization.

M.    Jurisdiction and Venue.  This Court has jurisdiction over the Debtors' Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Interim Order is entered in a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K) and (M).  The Court can enter final orders consistent with Article III of the United States Constitution.  Venue of these cases before this Court in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1 and 9013-1.

N.    Notice.  Telephonic, facsimile notice, or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the twenty (20) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (iii) counsel to the proposed DIP Agent; and (iv) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Local Rules.   Notice of the Interim Hearing in the Motion constitutes appropriate, due and sufficient notice thereof, complies with the Bankruptcy Rules and the Local Rules.  Based on the record, the Court finds, pursuant to sections 105 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), that notice of the Interim Hearing was adequate under all the circumstances set forth herein.

8

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

## Approval of Documents; Authorization to Borrow.

1.      <u>Motion Granted</u>.  The Motion is granted to the extent provided herein.  Any objections to the Motion and entry of the Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      <u>Approval of Documents</u>.  The DIP Facility, the DIP Facility Term Sheet, and the DIP Documentation are hereby approved on an interim basis subject to the terms of this Interim Order and the Final Order.  The failure to reference or discuss any particular provision of the DIP Facility Term Sheet or the DIP Documentation shall not affect the validity or enforceability of any such provision.

3.      <u>Authorization to Execute and Deliver Documents</u>.  The Debtors are hereby authorized and directed to (i) execute and deliver the DIP Facility Term Sheet and the DIP Documentation, including all documents that the DIP Lenders and the Debtors deem necessary to implement the transactions contemplated by the DIP Facility Term Sheet; and (ii) perform each of their obligations under, limit their expenditures, and comply with all of the terms and provisions of the DIP Facility Term Sheet, the Budget, and this Interim Order.  Furthermore, the Debtors are expressly authorized, empowered, and directed to do and perform all acts to make, execute, deliver, and implement all DIP Documentation and any other document of any kind required to be executed and delivered in connection therewith, and the terms and conditions of the DIP Documentation are made fully-enforceable against the Debtors.  Upon execution and delivery of the DIP Facility Term Sheet and the DIP Documentation, such documents shall constitute valid, binding and non-avoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Facility Term Sheet, the DIP Documentation, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  The Debtors are authorized and directed to pay all principal and interest that may be required or necessary for the Debtors to perform all of their obligations under this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation without any further order or approval of the Court.

4.      <u>Authorization to Borrow; the Budget</u>.  Good and sufficient cause has been shown for the entry of this Interim Order.  The Debtors are hereby authorized to incur the DIP Obligations and close the DIP Facility solely in accordance with and pursuant to the terms and provisions of the Budget, this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation.

5.      <u>Amendments</u>.  The DIP Lenders and the Debtors may amend, modify, supplement, or waive any provision of the DIP Documentation if such amendment, modification, supplement, or waiver is not material (in the good faith judgment of the DIP Lenders and the Debtors), without any need to apply to, or receive further approval from, the Court subject to providing notice to any appointed committee.  Any material amendment, modification,

supplement, or waiver shall be in writing, signed by the parties and approved by the Court on appropriate notice, including to any appointed committee.

6.      Use of Collateral (Including Cash Collateral).  The Debtors are authorized to use the Collateral (including the Cash Collateral) (as defined herein) during the period from the date of this Interim Order until the occurrence of a breach of the DIP Facility Term Sheet, or DIP Documentation, or the Maturity Date (unless the DIP Lenders agree in writing otherwise to allow use of Cash Collateral), for the same purposes as set forth in and in accordance with the terms and conditions of this Interim Order and the DIP Documentation, including, without limitation, the Budget, *provided* that (a) the DIP Lenders and the Prepetition Lenders are granted adequate protection; and (b) except on the terms and conditions of the DIP Documentation and this Interim Order, the Debtors shall not be permitted to use any Cash Collateral which constitutes proceeds of the Debtors' assets sales, except as otherwise consented to by the DIP Lenders and the Prepetition Lenders.  For the avoidance of doubt, any inventory, equipment, or other property purchased using Cash Collateral or the proceeds of the DIP Loans may not be used by, or transferred to, any non-Debtor, except to pay expenses under the Budget.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined by § 363(a) and shall include and consist of, without limitation, all cash, cash on sit in any deposit account or securities account of the Debtors, and cash proceeds of the Collateral and Prepetition Collateral in which the DIP Lenders holds an interest.

7.      Limitation on the Use of the DIP Loans and Cash Collateral.  Without the DIP Agent's prior written consent, acting at the direction of the DIP Lenders, the proceeds of the DIP Loans and Cash Collateral shall be used by the Debtors strictly in accordance with the Budget and subject to the Budget covenant (including Permitted Variances); provided that in no event shall the DIP Loans, Cash Collateral, Collateral, or Carve-Out be used for any of the following purposes: (i) object to or contest the validity or enforceability of the DIP Order, the Cash Collateral Order, or any obligations outstanding under the DIP Documentation, the Prepetition Credit Agreement, or Prepetition A/R Agreement; provided, that a creditor, or the official committee of unsecured creditors, if appointed in these Cases, may expend up to $20,000 for the fees and expenses incurred in connection with the investigation of (but not litigation, objection, or any challenge to) any prepetition secured claims and liens under the Prepetition Credit Agreement or Prepetition A/R Agreement (provided, however, that any such investigation shall be initiated and completed and any proceeding to object to or challenge any claims, security interests, or liens of the Prepetition Lenders or Prepetition A/R Lenders shall be commenced no later than sixty (60) days after the Petition Date (the "Challenge Deadline"); (ii) assert or prosecute any claim or cause of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, other than to enforce the terms of the DIP Facility or the DIP Order; (iii) seek to modify any of the rights granted under the DIP Order or the Cash Collateral Order to the DIP Agent, DIP Lenders, the Prepetition Agent, or the Prepetition Lenders; (iv) make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Budget covenant and, with respect to the payment of any prepetition claim or non-ordinary course administrative claim, separately approved by the Bankruptcy Court upon adequate notice to the DIP Agent on behalf of the DIP Lenders; (v) object to, contest, delay, prevent, or interfere with in any way with the exercise of rights and remedies by the DIP Agent and the DIP Lenders with respect to the Collateral once an Event of Default has occurred (except that the Debtors may contest or dispute whether an Event of Default has occurred and the Debtors shall be entitled to any notice provisions provided in the DIP Order); or (vi) except as

expressly provided or permitted hereunder or in the Budget, make any payment or distribution to any non-Debtor affiliate, equity holder, or insider of any Debtor outside of the ordinary course of business; provided that in no event shall any management, advisory, consulting or similar fees be paid to or for the benefit of any Debtor affiliate, equity holder, or insider.

8.      Budget Covenant.   Before the Petition Date, the Debtors delivered to the DIP Agent a 13-week budget commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Debtors' and any of their subsidiaries' consolidated projected receipts and disbursements for such 13-week period (such budget, as supplemented in the manner described below, the "Budget").   The Debtors shall deliver to the DIP Agent (for distribution to the DIP Lenders) a report (the "Budget Report"), delivered on Wednesday of each week commencing with the second full week after the Petition Date, showing actual receipts and disbursement through and including the immediately preceding week and explaining variances with respect to disbursements from the Budget that in the aggregate are an amount that is the greater of (i) 10% and (ii) $10,000 for all disbursements in the Budget.   Every two weeks, beginning on the Wednesday that is two weeks following the Petition Date, the Debtors shall deliver to the DIP Agent (for distribution to the DIP Lenders) supplements to the Budget showing projected receipts and disbursements for the subsequent 13 week period.   Beginning on the Wednesday that is two weeks following the Petition Date, and measured weekly thereafter, the Debtors shall not permit the actual total disbursements (excluding any disbursements that are or would be reimbursable by a liquidator) to exceed, on a trailing two-week basis, 105% of the total disbursements set forth in the Budget for such period, except as agreed by the DIP Agent in writing (the "Permitted Variances").   Within seven (7) days before the auction, the Debtors shall deliver to the DIP Agent (for distribution to the DIP Lenders) a budget that contemplates a liquidation of the Debtors' assets, including, without limitation, inventory, intellectual property, and equipment, and is in a form reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors (the "Liquidation Budget").

9.      Procedure for Delivery of Cash Proceeds.

(a)      Account Debtors. Without further order of court, the Debtors shall, or the DIP Lenders may directly, instruct all account debtors of the Debtors to make payments directly into the DIP Lenders' designated account or such other accounts satisfactory to the DIP Lenders, in which event all such cash proceeds shall be applied to the DIP Facility in accordance with this Interim Order.   The automatic stay is modified to permit such actions.

(b)      Cash Proceeds in DIP Lenders' Possession. The DIP Lenders are authorized to collect upon, convert to cash proceeds and enforce checks, drafts, instruments, and other forms of payment now or hereafter coming into its possession or under its control which constitute the Collateral or proceeds of the Collateral.

(c)      Deposit Accounts. The DIP Lenders shall control all deposits in all of Debtors' accounts with the DIP Lenders regardless of whether they are subject to any lockbox, blocked account, account control, or similar agreements.   All advances from the DIP Facility shall be deposited into the currently existing account of the Debtors as specified by the DIP Lenders, subject to further order of the Court permitting maintenance of such accounts.

10.      Payment under the DIP Facility.   The Debtors shall make payments to the DIP Lenders in accordance with the terms of this Interim Order, the DIP Facility Term Sheet, the DIP Documentation, the Budget, and in accordance with the procedures set forth herein.

11.      Superpriority Administrative Expense Claim; Waiver under Section 506(c).   All of the DIP Facility, subject to only the Carve-Out (as defined herein), shall have the status of an

allowed superpriority administrative expense claim in the Debtors' Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims, and all other claims against the Debtors and their estates, whether heretofore or hereafter incurred, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  Other than the Carve-Out, no claim or expense having a priority senior or *pari passu* to the priority granted to the DIP Lenders in the Interim Order shall be granted or permitted in the Debtors' Cases, or any superseding chapter 7 case, while any portion of the DIP Facility remains outstanding.

       12.    Carve-Out Terms.  The liens and super priority claims granted to the DIP Lenders with respect to the DIP Facility shall be subject and subordinate to a carve-out of the DIP Liens as follows: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) to the extent allowed at any time, but subject in all respects to the Budget covenant described herein, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any official committee of creditors (the "Committee") and allowed by the Bankruptcy Court at any time in an aggregate amount not to exceed $50,000 before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any official committee of unsecured creditors in an aggregate amount not to exceed $50,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap") (collectively, the "Carve-Out"), subject to the rights of the DIP Lenders, and any other party in interest, to review and object to the award of any such fees and expenses.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to the official committee of creditors, if any, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

       13.    Payment of Administrative Expenses.  Unless a material breach by the Debtors of the DIP Documentation shall have occurred (or would result from such payment), and subject to the Budget, the Debtors shall be permitted to pay, as the same may become due or authorized and payable, administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of their businesses.

       14.    Collateral Security.  For the funds advanced under the DIP Facility under this Interim Order, the DIP Lenders are hereby granted pursuant to section 364(c)(1), (2), (3) and (d) of the Bankruptcy Code, valid and perfected liens on, and security interests in, all of the Collateral, subject only to the Carve-Out (the "DIP Liens") to secure the DIP Facility and the

Prepetition Secured Claims.  The term "Collateral"  as used herein shall mean all present or future, pre-petition and post-petition, existing and after acquired real and personal, tangible and intangible assets of the Debtors, including, without limitation, all cash, cash equivalents, deposit accounts, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, leases, leasehold interests, fixtures, real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles (including, without limitation, all known or unknown claims, causes of action, or choses in action under applicable federal and state law), all known or unknown commercial tort claims and causes of actions and all proceeds thereof, all claims against former employees and all proceeds thereof, all claims for collection against customers and all proceeds thereof, all claims against the Hamiltons, One Flow, and Water Transfer and all proceeds thereof, all insurance claims for stolen property  and all proceeds thereof, all causes of actions and claims (whether asserted now or after the Petition Date) under the Debtors' existing directors and officers insurance policies and all insurance or other proceeds thereof ("D&O Actions"),; supporting obligations, letters of credit, letter-of-credit rights, investment property, and all cash or non-cash proceeds, products, offspring, substitutions, and accessions of any of the foregoing, wherever located, whether now or hereafter existing, whether presently owned and hereafter acquired, of every kind and description.

      15.    <u>No Subordination</u>.  The DIP Liens on, and security interests in, the Collateral granted to the DIP Lenders under this Interim Order and pursuant to the DIP Documentation shall not be subordinated to, or made *pari passu* with, any other lien or security interest, however and whenever arising, in the Debtors' Cases, or any superseding chapter 7 case, other than the Carve-Out.

      16.    <u>Automatic Perfection of DIP Liens</u>.

      (a)    The DIP Liens granted to the DIP Lenders under this Interim Order and under the DIP Documentation are valid, binding, continuing, enforceable, fully-perfected, and unavoidable with the priorities herein and therein set forth.

      (b)    The DIP Lenders shall not be required to file any financing statements, mortgages, deeds of trust, notices of lien, or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the DIP Liens granted by or pursuant to this Interim Order and the DIP Documentation.

      (c)    Should the DIP Lenders, in its sole discretion, from time to time, choose to file such financing statements, mortgages, notices of lien, or similar instruments, take possession of any Collateral securing the DIP Facility and the Prepetition Loan Documents for further evidence of perfection purposes, or take any other action to protect from infringement or otherwise validate or provide further notice of perfection of any DIP Lien, the Debtors and their respective officers are hereby directed to execute any such documents or instruments as the DIP Lenders shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order.

      (d)    In the sole discretion of the DIP Lenders, a certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of the Interim Order for filing and recording, and such certified copy shall be deemed filed and recorded at the time and on the date of entry of this Interim Order, as the case may be.

17.    <u>Maturity Date, Events of Default, Rights and Remedies</u>.

(a)    <u>Maturity Date</u>.  Unless extended by the Court upon the written agreement of the DIP Lenders, the Debtors' authorization to incur the DIP Facility and use Cash Collateral pursuant to this Interim Order will automatically terminate, and the DIP Lenders' commitments shall automatically terminate, upon the Maturity Date.  The term "Maturity" as used herein shall mean that all loans shall be repaid in full at the earliest of (i) the forty-fifth (45th) day following the Petition Date if, as of such date, the Bankruptcy Court shall not have entered the Final Order, (ii) six (6) months following the Petition Date, (iii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iv) the date of consummation of a sale of all or substantially all of the assets or stock of the Debtors under section 363 of the Bankruptcy Code (a "363 Sale"), and (v) the termination of the DIP Facility by the DIP Agent or the DIP Lenders upon an Event of Default.

(b)    <u>Events of Default</u>. The DIP Facility shall be subject to the events of default set forth in the Prepetition Loan Documents, modified as necessary to refer to the DIP Facility and to reflect the commencement of the Cases (without giving effect to any grace periods provided thereunder), and the following additional events of default (each an "Event of Default"): (i) Debtors' failure to meet any of the Milestones (as defined in the DIP Facility Term Sheet); (ii) Debtors' failure to obtain entry of the Interim Order by the 5th business day following the Petition Date; (iii) Debtors' failure to obtain entry of the Final Order by the 45th day following the Petition Date; (iv) Debtors' failure to comply with the terms of the Interim Order or the Final Order; (v) Debtors' failure to comply with the Budget (subject to any Permitted Variances); (vi) Debtors' failure to provide an updated budget, following the auction and/or sale closing and before entry into the PSA (as defined in the DIP Facility Term Sheet), for the period covering Phase 2 – Plan, satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion; (vii) Debtors' failure to perform (or to cause the performance of, as applicable), any term, provision, condition, covenant, or obligation under the DIP Facility Term Sheet, or DIP Documentation, and such failure not being remedied within five (5) business days after receipt of written notice of the failure; provided that the foregoing grace period shall not apply to (a) entry of a Final Order and (b) failure to meet any of the Milestones, neither of which, for the avoidance of doubt, shall be subject to any grace period; (viii) without the consent of the DIP Agent and the DIP Lenders, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Code approving) adequate protection to any prepetition agent or lender that is inconsistent with this Term Sheet or the DIP Order; (ix) the filing of any motion by the Debtors seeking to obtain credit or incur indebtedness, or the obtaining of credit and incurrence of indebtedness, by any Debtor that is: (A) secured by a security interest, mortgage, or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage, or other lien in favor of the DIP Agent, or (B) entitled to administrative priority status which is equal or senior to the DIP Claims (other than the Carve-Out); (x) the filing or commencement of any action or proceeding by the Debtors (or any third party with the Debtors' assistance or support) against the Prepetition Agent, the Prepetition Lenders, the DIP Agent, or the DIP Lenders by or on behalf of the Company or any of the Company's affiliates or any of their respective shareholders or agents; (xi) the filing or commencement of any action or proceeding for authority to recover by any person from the Collateral or any adequate protection liens granted with respect thereto for any costs of preservation or disposition thereof under section 506(c) of the Bankruptcy Code or authorizing the use of Cash Collateral without consent in writing by the DIP Agent and each of the DIP

Lenders; (xii) the filing or commencement of any action or proceeding by the Debtors (or any third party with the Debtors' assistance or support) seeking to challenge the validity of any portion of the DIP Documentation, the DIP Loans, the Prepetition Loan Documents, and the related obligations, or the applicability or enforceability of same, or which seeks to void, limit, subordinate, or otherwise adversely affect any security interest or lien created by or in relation to the DIP Documentation, the DIP Loans, or the Prepetition Loan Documents, or any payment pursuant thereto; (xiii) any lien or security interest purported to be created under this Interim Order, the DIP Documentation, the DIP Loans, or the Prepetition Loan Documents shall cease to be, or shall be asserted by the Debtors not to be, a valid and perfected lien on or security interest in any of the Collateral, with the priority as set forth herein, under the DIP Facility Term Sheet or DIP Documentation; (xiv) entry of one or more orders by the Court granting relief from or modifying the automatic stay to allow any one or more creditors to execute upon or enforce liens on or security interests in any assets of the Debtors (other than with respect to those Debtors for which the DIP Agent and the DIP Lenders provide prior written consent to such relief); (xv) a breach by the Debtors of any of their respective material post-petition obligations under the DIP Facility and/or DIP Documentation, including, without limitation, any obligations arising under any post-petition letter of credit facility; (xvi) reversal, vacatur, amendment, or modification (without the consent of the DIP Agent and the DIP Lenders), for a period in excess of five (5) days, of the Interim Order; (xvii) dismissal of the Debtors' Cases, conversion of any the Cases to a chapter 7 case, or the appointment of a chapter 11 trustee, an examiner, or responsible officer in these Cases (in any such case with expanded powers relating to operation of the business) and the relevant order therefor shall not be reversed or vacated within ten (10) days; (xviii) unless otherwise approved in writing by the DIP Agent, the entry of an order providing for a change of venue or division with respect to these Cases and such order shall not be reversed or vacated within ten (10) days; (xix) any material misrepresentation of fact made in writing by the Debtors to the DIP Agent or the DIP Lenders regarding the financial condition of the Debtors, or the nature, extent, location, or quality of any Collateral, or the disposition or use of any Collateral; or (xx) failure of the Debtors to comply with any covenant under the DIP Facility Term Sheet or DIP Documentation.

        (c)      <u>Rights and Remedies Upon Occurrence of an Event of Default</u>. Upon the Maturity Date, on not less than five (5) business days' prior written notice by the DIP Agent to counsel for the Debtors, the U.S. Trustee (and counsel to any appointed official committee of unsecured creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), the DIP Agent, in its sole discretion, may (i) declare the DIP Loans to be immediately due and payable, (ii) terminate the Company's ability to access the DIP Account and the DIP Loans and to use Cash Collateral; (iii) apply to or set off against the outstanding balance of the DIP Facility any Cash Collateral in the DIP Lenders' possession or control until such DIP Facility and Prepetition Secured Claims are indefeasibly and finally paid in full; and/or (iv) exercise all rights and remedies, without further notice, order of, application or motion to, the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code.  The Debtors shall not seek to enjoin, hinder, delay or object to the DIP Agent's exercise of rights and remedies in accordance with the DIP Documentation, and at any proceeding with respect to the DIP Agent's exercise of rights and remedies, the Debtors cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default.

(d)     <u>Rights and Remedies Upon Maturity</u>. On the fifth (5th) Business Day after the Maturity Date, at the DIP Lenders' election, (x) effective upon entry of a Final Order, this Court will thereafter conduct a § 363 sale on not less than 20 days' notice of all or such part of the Collateral designated by the DIP Lenders, in its sole discretion, and on terms acceptable to the DIP Lenders, in its sole discretion, with all proceeds to be used to pay the DIP Facility and Prepetition Secured Claims in the manner set forth in the DIP Documentation (and with the DIP Lenders preserving the right to credit bid in such sale, whether conducted under § 363 or pursuant to a plan); (y) without further order of the Court, the DIP Lenders shall have automatic and immediate relief from the automatic stay with respect to the Collateral (without regard to the passage of time provided for in Bankruptcy Rule 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to it under the DIP Facility Term Sheet, this Interim Order and applicable non-bankruptcy law with respect to the Collateral; and (z) the Debtors shall be authorized and directed (subject to notice requirements in these Cases, to the extent applicable) to execute a deed in lieu of foreclosure of all or part of the Collateral, in form and substance satisfactory to the DIP Lenders, in its sole discretion, and otherwise surrender the Collateral and to cooperate with the DIP Lenders in the exercise of their rights and remedies under the DIP Facility Term Sheet, this Interim Order and applicable non-bankruptcy law with respect to the Collateral; *provided*, *however*, that (a) during the five (5) Business Day period following the Maturity Date, the Debtors shall have the right to seek entry of an order determining that the Maturity Date has not occurred; provided that the Debtors may not use Cash Collateral during such five (5) Business Day period unless such use is agreed to in writing by the DIP Lenders or is for payment of amounts authorized under the Carve-Out, and the DIP Lenders shall have no obligation to advance the DIP Facility to the Debtors; and (b) solely for purposes of determining if the DIP Facility and the Prepetition Secured Claims have been paid in full, the value of any deed in lieu accepted by the DIP Lenders shall be determined on the date of acceptance by a certified financial appraiser selected by the DIP Lenders, in their sole discretion.

(e)     <u>State and Federal Law Restrictions</u>. Effective upon entry of a Final Order providing for such relief (if authorized), in connection with any exercise of rights and remedies by the DIP Lenders with respect to the DIP Facility, the Debtors hereby expressly waive their rights under any "single action," collateral first, anti-deficiency, or other rules or restrictions under state or federal law, and this Court hereby finds and concludes that any all such rules and restrictions with respect to the DIP Facility are superseded by this Interim Order.  If for any reason the waivers, findings, and conclusions in this paragraph are invalidated by any court of competent jurisdiction after the entry of this Interim Order, the DIP Lenders' covenants and agreements under this paragraph shall immediately cease, and the DIP Lenders shall be entitled to exercise its rights and remedies with respect to the DIP Facility in the same manner it would have as if the DIP Lenders had never exercised any of its rights and remedies under the DIP Facility Term Sheet, this Interim Order, or applicable non-bankruptcy law.

18.     <u>Additional Consideration for the DIP Facility</u>.  As additional consideration for the extension of the DIP Facility:

(a)     <u>Application of Cash Proceeds</u>.   The DIP Lenders, at its election, is authorized to apply all cash proceeds (and all monies received by the DIP Lenders under this Interim Order) now or hereafter coming into the DIP Lenders' possession or control in accordance with the terms of the DIP Documentation.  Subject to the Challenge Deadline, all such applications shall be final and not subject to challenge by any person, including any

committee or trustee.   Any amounts disgorged in connection with any such objection or determination shall be first applied to repay the DIP Facility.

(b)     Prohibition Against Additional Debt. The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the DIP Liens, or which is given superpriority administrative expense status under § 364(c)(1), unless, in addition to the satisfaction of all requirements of § 364 for the incurrence of such debt (i) the DIP Lenders has consented to any order authorizing the incurrence of additional debt; (ii) at the time of the entry of such an order, there are no monies under the DIP Facility outstanding, and no obligation of the DIP Lenders to extend additional monies under the DIP Documentation; or (iii) such credit or debt is first used to immediately and indefeasibly pay the DIP Facility and Prepetition Secured Claims in cash in full.

(c)     _(d)

(e)     Indemnity. The Debtors shall indemnify, pay and hold harmless the DIP Agent, the DIP Lenders and their affiliates (and their respective directors, officers, employees, agents, professionals, and advisors) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party) including the expenses incurred by the DIP Agent and the DIP Lenders and in connection with the negotiation, documentation and administration of the DIP Facility (including fees and expenses of counsel and other advisors), and expenses incurred by the DIP Lenders in connection with any default in respect of the DIP Facility and any exercise of remedies in respect thereof.

(f)     Out of Pocket Expenses. All fees, including legal and other professional fees (including any counsel and financial advisor to be retained by the DIP Agent or the DIP Lenders), and all reasonable out-of-pocket expenses associated with the DIP Facility, DIP Documentation and the Debtors' Cases are to be paid by the Debtors without the need for the filing of any applications with the Bankruptcy Court.  All borrowings by the Debtors, all costs, fees, and expenses of the DIP Agent or the DIP Lenders (including the fees and expenses of their professionals), and all other obligations owed to the DIP Agent or the DIP Lenders shall be charged to the DIP Account to be established under the DIP Facility, unless such costs, fees, expenses, and other obligations have been paid by the Debtors on a current basis.

19.     Adequate Protection of the Prepetition Lenders. As adequate protection of the interest of the Prepetition Lenders in the Prepetition Collateral on account of the Debtors' use of Cash Collateral and any decline in the value of the Prepetition Collateral resulting from the imposition of the automatic stay or the Debtors' use, sale, or other disposition of Cash Collateral and DIP Liens, the Prepetition Lenders shall receive the following:

(a)     Post-Petition Replacement Liens. The Debtors hereby grant, assign, and pledge to the Prepetition Lenders post-petition replacement security interests and liens (the "Post-Petition Replacement Liens"), subject to the Carve-Out, on all of the Debtors' receipts following entry of the Interim Order and on the Collateral.  Upon entry of the Interim Order, the Post-Petition Replacement Liens shall be valid, perfected, and enforceable without further filing, noticing, or recording of any document or instrument, or the taking of any further actions. The automatic stay is hereby modified to permit the Prepetition Lenders, DIP Agent, and the DIP Lenders to take all necessary or appropriate action, to perfect the Post-Petition Replacement Liens and the DIP Liens, or to maintain the perfection of the Prepetition Liens.

(b)     <u>Super-Priority Claim</u>. The Prepetition Lenders are hereby granted a super-priority claim (the "Adequate Protection Super-Priority Claim") that shall have priority over all other claims under § 364(c)(1), 503(b) and 507(b) and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 or 1114 of the Bankruptcy Code, subject only to the Carve-Out.  The Adequate Protection Super-Priority Claim shall, subject to the Carve-Out, be payable from and have recourse to all Prepetition Collateral and Collateral, including the proceeds of the Avoidance Actions.

(c)

(d)     <u>Professional Fees</u>. Under this Interim Order, the Debtors are authorized and directed to make payment of reasonable and documented fees and disbursements to the legal, financial, and other professionals retained by the Prepetition Agent and the Prepetition Lenders in cash within ten (10) business days of receipt of an invoice therefore (or all portions of such invoice to which the Debtors do not have a good faith objection, with the reasonableness of any disputed amounts to be determined forthwith by this Court), subject to the Notice of Fees (as defined herein).  No recipient of any such payment shall be required to file any interim or final fee application with the Bankruptcy Court or otherwise seek bankruptcy court approval of any such payments.

(e)     <u>Maintenance of the Collateral</u>. The Debtors shall maintain and insure the Collateral on commercially reasonable terms, consistent with past practice and as required in the Prepetition Loan Documents, the DIP Facility Term Sheet, or the DIP Documentation.

(f)     <u>Additional Protection</u>. The Prepetition Lenders reserve the right to petition the Court for such additional adequate protection of the Prepetition Liens as the Prepetition Lenders may reasonably require or for relief from or modification of the automatic stay under § 362.  The accounts that, as of the Petition Date, have been sold pursuant to the Prepetition A/R Agreement are not property of the estate (attached as Exhibit "1").  These accounts are not property of the estate under Section 541 and thus the automatic stay of 11 U.S.C. §362(a) does not apply to those accounts.

20.     <u>Binding Effect of Interim Order; Successors and Assigns; Survival</u>.  The DIP Facility Term Sheet, the DIP Documentation, and the provisions of this Interim Order subject to a Final Order shall be binding upon all parties-in-interest in these Cases, including without limitation, the DIP Lenders and any committee appointed in these Cases and the Debtors and their respective successors and assigns, including, without limitation, any chapter 11 trustee or chapter 7 trustee or similar responsible person hereafter appointed as a representative of the Debtors' estates and any such successors or assigns, without further order of this Court and shall inure to the benefit of the DIP Lenders and the Debtors and their respective successors and assigns.  The Debtors and their respective successors and assigns shall be deemed authorized and directed to comply with the provisions of the DIP Facility Term Sheet and the DIP Documentation; *provided*, *however*, that the DIP Lenders shall have no obligation to permit the use of the Collateral or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estates of the Debtors, subject only to the Carve-Out.  The provisions of this Interim Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in these Cases (i) confirming any chapter 11 plan; (ii) converting these

Cases to cases under chapter 7; or (iii) solely to the extent authorized by applicable law, dismissing these Cases. The terms and provisions of this Interim Order, including the rights granted to the DIP Lenders under §§ 364(c) and (d), shall continue in full force and effect until all of the DIP Facility and the Prepetition Secured Claims are indefeasibly and finally paid in cash in full and discharged.

21.     No Impairment of Liens.      The liens, security interests, Superpriority Administrative Expense Claims, DIP Liens, DIP Facility, and other rights and remedies granted to the DIP Lenders under the Interim Order, the DIP Facility Term Sheet, or the DIP Documentation and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, altered, or impaired in any manner by (a) any other financing or extension of credit or incurrence of debt by the Debtors (under section 364 of the Bankruptcy Code or otherwise), (b) the entry of an order confirming any plan of reorganization, (c) the entry of an order converting the Debtors' Cases to chapter 7 or dismissing these Cases, or (d) upon the Maturity Date. This Interim Order, the DIP Facility Term Sheet, and the DIP Documentation shall continue in force in the Debtors' Cases or any superseding chapter 7 cases, and the liens and security interests granted to the DIP Lenders and the Superpriority Administrative Expense Claims and payment provisions contained in the DIP Facility Term Sheet, the DIP Documentation, or the Interim Order shall continue in effect until the DIP Facility and the Prepetition Secured Claims are indefeasibly satisfied, paid, and discharged.

22.     Good Faith.  Having been found to be extending the DIP Facility to the Debtors in good faith, the DIP Lenders are entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the DIP Facility and the Superpriority Administrative Expense Claims and liens and security interests created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed, or modified on appeal. If any provision of this Interim Order is hereafter modified, vacated, reversed, or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal, or stay shall not affect the validity, enforceability, and priority of any of the debts, claims, liens, and security interests granted to the DIP Lenders under this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation, and the validity, enforceability, or priority of the debtors, claims, liens, and security interests of the DIP Lenders shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders shall be entitled to all of the rights, privileges, and benefits granted herein, including, without limitation, the liens, security interests, and priorities granted to the DIP Lenders in this Interim Order with respect to the DIP Facility.

23.     No Marshalling.  In no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

24.     No Waiver. The DIP Lenders' failure, at any time or times hereafter, to require strict performance by the Debtors (or by any trustee) of any provision of this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation shall not waive, affect or diminish any right of the DIP Lenders, as the case may be, thereafter to demand strict compliance and performance therewith. No delay on the part of the DIP Lenders in the exercise of any right or remedy under this Order, the DIP Facility Term Sheet, the DIP Documentation, the Bankruptcy Code, or applicable non-bankruptcy law shall preclude any other or further exercise of any right or remedy. The DIP Lenders shall not be deemed to have suspended or waived any of its rights or remedies under this Order, the DIP Facility Term Sheet, the DIP Documentation, the Bankruptcy

Code, or applicable non-bankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtors.

25.     <u>Financial Information</u>.  The Debtors are hereby directed to deliver to the DIP Lenders such financial and other information, documents, and communications concerning the business and affairs of the Debtors, including, without limitation, the Debtors' net operating losses ("NOL"), and all claims or causes of action against any third party, including, without limitation, claims or causes of action against the Debtors' directors and officers, and any of the Collateral, as may be required under the DIP Facility Term Sheet, the DIP Documentation, and/or as the DIP Lenders shall reasonably request from time to time.  The Debtors are also directed to allow the DIP Lenders access to persons knowledgeable of the Debtors' business and the Debtors' business premises in accordance with the terms of the DIP Facility Term Sheet or the DIP Documentation for the purpose of enabling the DIP Lenders to inspect and audit the Collateral and the Debtors' books and records.

26.     <u>Limitation on Charging Expenses Against Collateral</u>.  Except as set forth herein, no costs or expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including the Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lenders, no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lenders to any charge, lien, assessment, or claim against the Collateral (including the Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise, and further provided that the Debtors expressly waive all of their rights to charge any costs or expenses against or recover from the Collateral (including the Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

27.     <u>Notice of and Objections to Post-Petition Expenses</u>. The DIP Lenders shall provide summaries of all invoices with respect to the DIP Lenders' attorneys' fees and related costs and expenses asserted that are incurred after the entry of this Interim Order to (i) counsel for the Debtors; (ii) the U.S. Trustee; and (iii) counsel for any appointed committee (the "Notice of Fees").  Any such party may object to the reasonableness of any such fees, costs, and expenses; however, any such objection shall be forever waived and barred unless, (i) the objection is filed with the Court and served upon the DIP Lenders and its counsel within ten (10) days of receipt of the summary of the invoice to which the objection relates and (ii) the objection describes with particularity the items or categories of fees, costs, and expenses that are the subject of the objection and provides the specific basis of the objection to each such item or category of fees, costs, and expenses to the extent practicable based upon documentation provided by the DIP Lenders.  Any hearing on an objection to the fees, costs, and expenses set forth on any invoice summary shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs, and expenses which are the subject of such objection.  The disallowance of any such fees and expenses shall not affect the DIP Lenders' right to collect such amounts from any person or entity other than the Debtors.

28.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Lenders pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly,

sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.

29.     Insurance.  The DIP Lenders shall be (if not already in effect) immediately named and added to be the loss payee under the Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Facility and the Prepetition Secured Claims, and second, to the Debtors.

30.     Automatic Stay.  The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the DIP Lenders to take any action authorized or contemplated by this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation and to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in this Interim Order, the DIP Facility Term Sheet, or the DIP Documentation.

31.     No Control.  By consenting to this Interim Order, by making advances, loans, or extending financial accommodations of any type, kind, or nature under this Interim Order or by administering the loans made hereunder, the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtors.

32.     Reimbursement of Fees and Expenses.  Upon receiving written demand therefor (together with backup documentation supporting such request), the Debtors shall (i) pay or reimburse the DIP Lenders for all reasonable out-of-pocket costs and expenses incurred in connection with the negotiation, preparation, execution, and delivery of, and any amendment, supplement, waiver, or modification to, the DIP Facility Term Sheet, DIP Documentation, the Interim Order, and any other documents prepared in connection herewith or therewith, their monitoring of and involvement and participation in these Cases, and the consummation and administration of the transactions (including the reasonable expenses of the DIP Lenders' due diligence investigation including third party appraisers, advisors, consultants, lien and title investigations, and collateral monitoring services) contemplated hereby and thereby, including the reasonable fees and disbursements of their advisors and counsel for each applicable jurisdiction, (ii) pay or reimburse the DIP Lenders for all reasonable costs and expenses incurred in connection with the enforcement or preservation of any rights under the DIP Facility Term Sheet, the DIP Documentation, the Interim Order, and any such other documents related thereto, including, without limitation, the reasonable fees and disbursements of their respective advisors and counsel for each applicable jurisdiction, and the reasonable fees and disbursements incurred in obtaining relief from the automatic stay under the Bankruptcy Code or other stay or injunction restricting DIP Lenders' enforcement activities and proceedings, (iii) pay, indemnify, and hold harmless the DIP Lenders from and against any and all recording and filing taxes, assessments, and fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the DIP Facility Term Sheet, the DIP Documentation, the Interim Order, or the Final Order, and any such other documents related thereto, and (iv) pay, indemnify, and hold harmless the DIP Lenders (and its directors, trustees, officers, employees,

affiliates, controlling persons, agents, attorneys, professionals, advisors, successors and assigns) from and against, any and all other actual liabilities, obligations, losses, damages, penalties, actions, judgments, suits, and related reasonable and documented out of pocket costs, expenses or disbursements of any kind or nature whatsoever (other than for Lender's gross negligence or willful misconduct as determined by a final and non-appealable order of the Court) including the reasonable fees and disbursements of financial advisor and counsel for each applicable jurisdiction with respect to the execution, delivery, enforcement, performance, and administration of the DIP Facility Term Sheet, the DIP Documentation, the Interim Order, and any such other documents related thereto (all the foregoing in this clauses (i) through (iv), collectively, the "Indemnified Liabilities"); *provided*, *however*, that the Debtors shall not have any obligation hereunder to the DIP Lenders with respect to Indemnified Liabilities arising from the fraudulent actions, gross negligence, bad faith, or willful misconduct of the DIP Agent or the DIP Lenders (or any of its directors, trustees, officers, employees, affiliates, controlling persons, agents, attorneys, professionals, advisors, successors, and assigns) as determined by a final and non-appealable order of the Court.

33. Exculpation. Nothing in the Interim Order, the DIP Facility Term Sheet, the DIP Documentation or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operations of their businesses, or in connection with their restructuring efforts. So long as the DIP Lenders complies with its obligations under the DIP Documentation and this Interim Order and its obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors and their estates.

34. Inconsistency. In the event of any irreconcilable inconsistency between this Interim Order, the DIP Facility Term Sheet, the DIP Documentation, or any other agreement heretofore or hereafter entered into by and between the Debtors and the DIP Lenders, the terms of this Interim Order shall govern and control. ~~To the extent that there is any provision not in this Interim Order that is required to be so pursuant to the DIP Facility Term Sheet or the DIP Documentation, such provisions are hereby deemed incorporated in this Interim Order.~~

35. Retention of Jurisdiction. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

36. ~~Immediate Docketing of Interim Order. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Debtors' Cases.~~

37. Effectiveness. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil

22

Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

      38.    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

      39.    Notwithstanding anything contained herein to the contrary, no equipment referred to and/or described in that certain Master Lease Agreement #928619-0 dated 1/30/15 and those certain Lease Schedule Nos. 928619-1, 928619-2, 928619-3, and 928619-4 (all as amended, restated, supplemented, or otherwise modified from time to time) by and between Axis Capital, Inc. and HII, shall be primed by any liens and/or security interests granted to the DIP Lender pursuant to Section 364 of the Bankruptcy Code or otherwise.

      40.    <u>Final Hearing</u>.  A final hearing to consider the Motion is scheduled for __October 5__, 2015 at 2:30 p.m.  Any objections to the Final Order must be filed with the Clerk of the Bankruptcy Court and served upon counsel to the Debtors, the United States Trustee, counsel for the DIP Agent, the DIP Lenders, and counsel to the Committee, if any, on or before __October 1__, 2015 at 5:00 p.m.

**Signed: September 23, 2015**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

IH Technologies
Wind Down Budget - DRAFT

EXHIBIT A

| CASH RECEIPTS AND DISBURSEMENTS | CH 11 | WEEK #1 9/21/2015 | WEEK #2 9/28/2015 | WEEK #3 10/5/2015 | WEEK #4 10/12/2015 | WEEK #5 10/19/2015 | AUC | WEEK #6 10/26/2015 | WEEK #7 11/2/2015 | WEEK #8 11/9/2015 | WEEK #9 11/16/2015 | REST. | WEEK #10 11/23/2015 | WEEK #11 11/30/2015 | WEEK #12 12/7/2015 | WEEK #13 12/14/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASH, BEGINNING OF WEEK | | $ - | $ 125,443 | $ 76,048 | $ 158,798 | $ 249,276 | | $ 252,747 | $ 250,092 | $ 201,792 | $ 319,209 | | $ 448,103 | $ 190,139 | $ 202,477 | $ 461,150 |
| RECEIPTS | | | | | | | | | | | | | | | | |
| Receivable Collections | | 75,000 | 100,000 | 100,000 | 140,721 | 140,721 | | 148,645 | 148,645 | 148,645 | 148,645 | | 262,423 | 262,423 | 262,423 | 262,423 |
| Proceeds from Liquidation | | - | - | - | - | - | | - | TBD | - | - | | TBD | | | |
| Other Receipts | | - | 3,000 | - | - | - | | 3,000 | - | - | 5,000 | | TBD | | | |
| TOTAL RECEIPTS | | 75,000 | 103,000 | 100,000 | 140,721 | 140,721 | | 151,645 | 148,645 | 148,645 | 153,645 | | 262,423 | 262,423 | 262,423 | 262,423 |
| DISBURSEMENTS | | | | | | | | | | | | | | | | |
| DIRECT OPERATING DISBURSEMENTS | | | | | | | | | | | | | | | | |
| Contract Labor | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Equipment Purchases | | - | - | - | - | 120,000 | | - | - | - | - | | - | - | - | - |
| Other Expenses | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| TOTAL DIRECT OPERATING DISBURSEMENTS | | - | - | - | - | 120,000 | | - | - | - | - | | - | - | - | - |
| G&A DISBURSEMENTS | | | | | | | | | | | | | | | | |
| Software & IT | | - | 2,740 | - | 500 | - | | 2,740 | - | 500 | - | | - | - | - | - |
| Office Expenses | | - | 9,658 | - | - | - | | 8,798 | 860 | - | - | | - | - | - | - |
| Payroll | | 10,145 | 8,136 | - | 8,136 | - | | 8,136 | - | 8,136 | - | | 8,136 | - | - | - |
| Professional Fees - Collections & SEC Filings | | - | - | - | - | - | | 20,000 | - | - | - | | - | 20,000 | - | - |
| Insurance | | 16,162 | 2,176 | - | 24,357 | - | | 1,376 | - | 10,341 | - | | - | - | - | - |
| Contract Labor | | 7,250 | 7,250 | 7,250 | 7,250 | 7,250 | | 7,250 | 7,250 | 7,250 | 7,250 | | 7,250 | 3,750 | 3,750 | 3,750 |
| Miscellaneous | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | | 5,000 | - | - | - |
| TOTAL G&A DISBURSEMENTS | | 38,557 | 34,960 | 12,250 | 45,243 | 12,250 | | 53,300 | 13,110 | 31,228 | 12,250 | | 20,386 | 23,750 | 3,750 | 3,750 |
| RESTRUCTURING ADVISORS [a] | | | | | | | | | | | | | | | | |
| Financial Advisors - SRR | | - | - | - | - | - | | 40,000 | - | - | - | | 50,000 | | | |
| Legal - McKool Smith | | - | - | - | - | - | | 50,000 | - | - | - | | 60,000 | | | |
| Creditor Committee | | - | - | - | - | - | | TBD | - | - | - | | TBD | | | |
| TOTAL RESTRUCTURING ADVISORS [a] | | - | - | - | - | - | | 90,000 | - | - | - | | 110,000 | - | - | - |
| OTHER DISBURSEMENTS | | | | | | | | | | | | | | | | |
| Equipment Relocation & Sale Costs [b] | | - | 3,600 | - | - | - | | 1,000 | 75,000 | - | - | | - | - | - | - |
| Security (Cameras, etc.) | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | - | - | - | - | | - | - | - | - |
| Factoring Fee | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Payables in Arrears (Critical Vendors) | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Chapter 11 Filing Fees | | 6,000 | - | - | - | - | | 10,000 | - | - | - | | - | 7,500 | - | - |
| Funding the Liquidation Trust | | - | - | - | - | - | | - | - | - | - | | 500,000 | - | - | - |
| TOTAL OTHER DISBURSEMENTS | | 11,000 | 8,600 | 5,000 | 5,000 | 5,000 | | 11,000 | 75,000 | - | - | | 500,000 | 7,500 | - | - |
| TOTAL DISBURSEMENTS | | 49,557 | 43,560 | 17,250 | 50,243 | 137,250 | | 154,300 | 88,110 | 31,228 | 12,250 | | 520,386 | 141,250 | 3,750 | 3,750 |
| NET CASH FLOW [b] | | 25,443 | 59,440 | 82,750 | 90,478 | 3,471 | | (2,655) | 60,535 | 117,417 | 141,395 | | (257,964) | 121,173 | 258,673 | 258,673 |
| CASH BEFORE BORROWING | | 25,443 | 184,883 | 158,798 | 249,276 | 252,747 | | 250,092 | 310,626 | 319,209 | 460,603 | | 190,139 | 311,312 | 461,150 | 719,823 |
| Interest Payments & Loan Fees | | | (108,835) | | | | | (108,835) | | (12,500) | | | (108,835) | | | |
| Cash from Borrowing | | | | | | | | | | | | | | | | |
| Term Loan 2 | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Debtor in Possession Financing | | 100,000 | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Total Cash from Borrowing | | 100,000 | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Loan Repayments | | | | | | | | | | | | | | | | |
| Heartland Purchase Agreement | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Term Loan 1 | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Term Loan 2 | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Debtor in Possession Financing | | | | | | | | | | | | | | | | |
| Total Loan Repayments | | - | - | - | - | - | | - | - | - | - | | - | - | - | - |
| Net Cash from Borrowing | | 100,000 | (108,835) | | | | | (108,835) | - | (12,500) | | | (108,835) | | | |
| CASH, END OF WEEK | | $ 125,443 | $ 76,048 | $ 158,798 | $ 249,276 | $ 252,747 | | $ 250,092 | $ 201,792 | $ 319,209 | $ 448,103 | | $ 190,139 | $ 202,477 | $ 461,150 | $ 719,823 |
| Loan Balances | | | | | | | | | | | | | | | | |
| Heartland Purchase Agreement | | 890,681 | 890,681 | 890,681 | 890,681 | 890,681 | | 890,681 | 890,681 | 890,681 | 890,681 | | 890,681 | 890,681 | 890,681 | 890,681 |
| Term Loan 1 | | 9,556,062 | 9,556,062 | 9,556,062 | 9,556,062 | 9,556,062 | | 9,556,062 | 9,556,062 | 9,556,062 | 9,556,062 | | 9,556,062 | 9,556,062 | 9,556,062 | 9,556,062 |
| Term Loan 2 | | 736,835 | 736,835 | 736,835 | 736,835 | 736,835 | | 736,835 | 736,835 | 736,835 | 736,835 | | 736,835 | 736,835 | 736,835 | 736,835 |
| Debtor in Possession Financing | | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | | 100,000 | 100,000 | 100,000 | 100,000 | | 100,000 | 100,000 | 100,000 | 100,000 |
| Total Debt | | 11,283,578 | 11,283,578 | 11,283,578 | 11,283,578 | 11,283,578 | | 11,283,578 | 11,283,578 | 11,283,578 | 11,283,578 | | 11,283,578 | 11,283,578 | 11,283,578 | 11,283,578 |

Footnotes
[a] Restructuring Advisor and Creditor Committee fees are estimates that are subject to change based upon the Chapter 11 proceedings
[b] Estimated marketing fees for the sale of assets is expected to be 15%, which is not shown because sale proceeds are TBD at this time.

Exhibit "1"

# BusinessManager Aged Receivables by Invoice Date

## HII Technologies, Inc.

**As of: 9/16/2015**

| Customer Name: | OCCIDENTAL OIL AND GAS | Credit Limit: | $.00 | Last Payment Date: | 9/2/2015 | Total AR Balance / %: | $1,163,723.53 / 31.95% |
| Customer Code: | OCCIDENTAL OIL AND GAS | Insurance Limit: | $.00 | Last Payment Amount: | $55,550.00 | Funded Balance / %: | $609,421.81 / 68.42% |
| Phone: | 972-404-3800 | Default Pymt. Term: | Net 30 1 | | | Unapplied Credits: | $0.00 |

| Doc Nbr | Trans Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 6561 | 4/26/2015 | Invoice | | $9,850.75 | | | | $750.75 | 143 |
| 6575 | 4/26/2015 | Invoice | | $7,956.38 | | | | $606.38 | 143 |
| 6583 | 4/26/2015 | Invoice | | $18,077.75 | | | | $1,377.75 | 143 |
| 6599 | 4/26/2015 | Invoice | | $13,260.63 | | | | $1,010.63 | 143 |
| 6603 | 4/26/2015 | Invoice | | $17,428.25 | | | | $1,328.25 | 143 |
| 6608 | 4/26/2015 | Invoice | | $11,366.25 | | | | $866.25 | 143 |
| 6611 | 4/26/2015 | Invoice | | $13,260.63 | | | | $1,010.63 | 143 |
| 6614 | 4/26/2015 | Invoice | | $10,608.50 | | | | $808.50 | 143 |
| 6617 | 4/26/2015 | Invoice | | $9,282.44 | | | | $707.44 | 143 |
| 6621 | 4/26/2015 | Invoice | | $11,366.25 | | | | $866.25 | 143 |
| 6640 | 4/30/2015 | Invoice | | $7,577.50 | | | | $577.50 | 139 |
| 6641 | 4/30/2015 | Invoice | | $8,822.38 | | | | $672.38 | 139 |
| 6642 | 4/30/2015 | Invoice | | $2,381.50 | | | | $181.50 | 139 |
| 6643 | 4/27/2015 | Invoice | | $4,925.38 | | | | $375.38 | 142 |
| 6644 | 4/29/2015 | Invoice | | $5,683.13 | | | | $433.13 | 140 |
| 6645 | 4/30/2015 | Invoice | | $9,959.00 | | | | $759.00 | 139 |
| 6646 | 4/30/2015 | Invoice | | $14,180.75 | | | | $1,080.75 | 139 |
| 6648 | 4/28/2015 | Invoice | | $3,788.75 | | | | $288.75 | 141 |
| 6649 | 4/28/2015 | Invoice | | $3,031.00 | | | | $231.00 | 141 |
| 6650 | 4/28/2015 | Invoice | | $2,652.13 | | | | $202.13 | 141 |
| 6651 | 4/27/2015 | Invoice | | $7,577.50 | | | | $577.50 | 142 |
| 6652 | 4/25/2015 | Invoice | | $15,243.13 | | | | $743.13 | 144 |
| 6653 | 4/25/2015 | Invoice | | $15,243.13 | | | | $743.13 | 144 |
| 6654 | 4/30/2015 | Invoice | | $7,266.24 | | | | $7,266.24 | 139 |

# BusinessManager Aged Receivables by Invoice Date - HII Technologies, Inc.

As of: 9/16/2015

Customer Name: OCCIDENTAL OIL AND GAS
Customer Code: OCCIDENTAL OIL AND GAS
Phone: 972-404-3800

| | | |
|---|---|---|
| Credit Limit: $.00 | Last Payment Date: 9/2/2015 | Total AR Balance / %: $1,163,723.53 / 31.95% |
| Insurance Limit: $.00 | Last Payment Amount: $55,550.00 | Funded Balance / %: $609,421.81 / 68.42% |
| Default Pymt. Term: Net 30 I | | Unapplied Credits: $0.00 |

| Doc_Nbr | Trans_Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over_120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 6658 | 4/26/2015 | Invoice | | $21,023.95 | | | | $1,024.95 | 143 |
| 6659 | 4/30/2015 | Invoice | | $12,013.69 | | | | $585.69 | 139 |
| 6660 | 4/26/2015 | Invoice | | $21,134.33 | | | | $1,030.33 | 143 |
| 6661 | 4/30/2015 | Invoice | | $12,076.76 | | | | $588.76 | 139 |
| 6663 | 5/3/2015 | Invoice | | $7,469.25 | | | | $569.25 | 136 |
| 6664 | 4/30/2015 | Invoice | | $17,428.25 | | | | $1,328.25 | 139 |
| 6665 | 5/10/2015 | Invoice | | $2,165.00 | | | | $165.00 | 129 |
| 6666 | 5/5/2015 | Invoice | | $2,976.88 | | | | $226.88 | 134 |
| 6667 | 5/5/2015 | Invoice | | $13,260.63 | | | | $1,010.63 | 134 |
| 6668 | 5/3/2015 | Invoice | | $11,203.88 | | | | $853.88 | 136 |
| 6669 | 5/10/2015 | Invoice | | $26,142.38 | | | | $1,992.38 | 129 |
| 6670 | 5/3/2015 | Invoice | | $5,683.13 | | | | $433.13 | 136 |
| 6671 | 5/10/2015 | Invoice | | $9,471.88 | | | | $721.88 | 129 |
| 6677 | 5/10/2015 | Invoice | | $18,396.88 | | | | $5,391.39 | 129 |
| 6678 | 5/10/2015 | Invoice | | $7,577.50 | | | | $577.50 | 129 |
| 6679 | 5/17/2015 | Invoice | | $18,396.88 | | | | $18,396.88 | 122 |
| 6684 | 5/17/2015 | Invoice | | $12,250.00 | | | | $12,250.00 | 122 |
| 6685 | 5/24/2015 | Invoice | | $12,250.00 | | | $12,250.00 | | 115 |
| 6686 | 5/17/2015 | Invoice | | $21,350.00 | | | | $21,350.00 | 122 |
| 6687 | 5/24/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 115 |
| 6688 | 5/31/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 108 |
| 6689 | 5/31/2015 | Invoice | | $12,250.00 | | | $12,250.00 | | 108 |
| 6690 | 5/22/2015 | Invoice | | $21,510.68 | | | $21,510.68 | | 117 |
| 6691 | 5/17/2015 | Invoice | | $12,250.00 | | | | $12,250.00 | 122 |
| 6692 | 5/17/2015 | Invoice | | $1,750.00 | | | | $1,750.00 | 122 |
| 6693 | 5/17/2015 | Invoice | | $16,100.00 | | | | $16,100.00 | 122 |

*BusinessManager Aged Receivables by Invoice Date - Hil Technologies, Inc.*

As of: 9/16/2015

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Customer Name:** | OCCIDENTAL OIL AND GAS | **Credit Limit:** | $0.00 | **Last Payment Date:** | | 9/2/2015 | **Total AR Balance / %:** | | $1,163,723.53 / 31.95% |
| **Customer Code:** | OCCIDENTAL OIL AND GAS | **Insurance Limit:** | $0.00 | **Last Payment Amount:** | | $55,550.00 | **Funded Balance / %:** | | $609,421.81 / 68.42% |
| **Phone:** | 972-404-3800 | **Default Pymt. Term:** | Net 30 | | | | **Unapplied Credits:** | | $0.00 |

| Doc Nbr | Trans. Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 6694 | 5/17/2015 | Invoice | | $21,250.00 | | | | $21,250.00 | 122 |
| 6695 | 5/24/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 115 |
| 6696 | 5/31/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 108 |
| 6697 | 5/15/2015 | Invoice | | $8,750.00 | | | | $8,750.00 | 124 |
| 6698 | 5/22/2015 | Invoice | | $10,500.00 | | | $10,500.00 | | 117 |
| 6699 | 5/24/2015 | Invoice | | $26,250.00 | | | $26,250.00 | | 115 |
| 6700 | 5/28/2015 | Invoice | | $21,000.00 | | | $21,000.00 | | 111 |
| 6701 | 5/17/2015 | Invoice | | $5,750.00 | | | | $5,750.00 | 122 |
| 6702 | 5/17/2015 | Invoice | | $5,750.00 | | | | $5,750.00 | 122 |
| 6703 | 5/24/2015 | Invoice | | $17,850.00 | | | $17,850.00 | | 115 |
| 6704 | 5/31/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 108 |
| 6705 | 5/31/2015 | Invoice | | $18,900.00 | | | $18,900.00 | | 108 |
| 6706 | 5/24/2015 | Invoice | | $16,100.00 | | | $16,100.00 | | 115 |
| 6711 | 5/31/2015 | Invoice | | $19,700.00 | | | $19,700.00 | | 108 |
| 6745 | 6/7/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 101 |
| 6746 | 6/14/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 94 |
| 6747 | 6/21/2015 | Invoice | | $16,100.00 | | $16,100.00 | | | 87 |
| 6748 | 6/7/2015 | Invoice | | $12,250.00 | | | $12,250.00 | | 101 |
| 6749 | 6/14/2015 | Invoice | | $9,625.00 | | | $9,625.00 | | 94 |
| 6750 | 6/21/2015 | Invoice | | $6,125.00 | | $6,125.00 | | | 87 |
| 6751 | 6/7/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 101 |
| 6752 | 6/14/2015 | Invoice | | $16,650.00 | | | $16,650.00 | | 94 |
| 6753 | 6/16/2015 | Invoice | | $3,500.00 | | | $3,500.00 | | 92 |
| 6754 | 6/7/2015 | Invoice | | $21,350.00 | | | $21,350.00 | | 101 |
| 6755 | 6/12/2015 | Invoice | | $13,150.00 | | | $13,150.00 | | 96 |
| | | | **Customer Totals:** | $988,271.30 | $0.00 | $22,225.00 | $423,635.68 | $163,561.13 | |

*BusinessManager Aged Receivables by Invoice Date - HiI Technologies, Inc.*

As of: 9/16/2015

**Customer Name:** PIONEER NATURAL
**Customer Code:** PIONEER NATURAL
**Phone:** 972-969-5604

| | | |
|---|---|---|
| **Credit Limit:** $200,000.00 | **Last Payment Date:** 6/19/2015 | **Total AR Balance / %:** $476,580.04 / 13.09% |
| **Insurance Limit:** $.00 | **Last Payment Amount:** $67,026.00 | **Funded Balance / %:** $25,850.00 / 2.90% |
| **Default Pymt. Term:** Net 30 l | | **Unapplied Credits:** $0.00 |

| Doc Nbr | Trans Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 300560 | 3/11/2015 | Invoice | | $9,400.00 | | | | $9,400.00 | 189 |
| 300610 | 5/31/2015 | Invoice | | $16,450.00 | | | $16,450.00 | | 108 |
| | | | **Customer Totals:** | $25,850.00 | $0.00 | $0.00 | $16,450.00 | $9,400.00 | $0.00 |

**Customer Name:** SANCHEZ OIL & GAS
**Customer Code:** SANCHEZ OIL & GAS
**Phone:** 713-783-8000 x3121

| | | |
|---|---|---|
| **Credit Limit:** $200,000.00 | **Last Payment Date:** 8/31/2015 | **Total AR Balance / %:** $292,144.99 / 8.02% |
| **Insurance Limit:** $.00 | **Last Payment Amount:** $3,556.01 | **Funded Balance / %:** $255,408.90 / 28.68% |
| **Default Pymt. Term:** Net 15 l | | **Unapplied Credits:** $0.00 |

| Doc Nbr | Trans Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 1120 | 3/31/2015 | Invoice | | $13,946.39 | | | | $13,946.39 | 169 |
| 1138B | 4/29/2015 | Invoice | | $920.13 | | | | $920.13 | 140 |
| 1140 | 4/29/2015 | Invoice | | $5,060.69 | | | | $5,060.69 | 140 |
| 1141 | 4/29/2015 | Invoice | | $3,680.50 | | | | $3,680.50 | 140 |
| 1142 | 4/29/2015 | Invoice | | $1,380.19 | | | | $1,380.19 | 140 |
| 1143 | 4/29/2015 | Invoice | | $2,300.31 | | | | $2,300.31 | 140 |
| 1144 | 4/29/2015 | Invoice | | $2,300.31 | | | | $2,300.31 | 140 |
| 1145 | 4/30/2015 | Invoice | | $13,206.50 | | | | $13,206.50 | 139 |
| 1146 | 4/30/2015 | Invoice | | $4,546.50 | | | | $4,546.50 | 139 |
| 1147 | 4/30/2015 | Invoice | | $9,904.88 | | | | $9,904.88 | 139 |
| 1148 | 4/30/2015 | Invoice | | $13,206.50 | | | | $13,206.50 | 139 |
| 1149 | 4/30/2015 | Invoice | | $13,206.50 | | | | $13,206.50 | 139 |
| 1150 | 4/30/2015 | Invoice | | $13,206.50 | | | | $13,206.50 | 139 |
| 1151 | 4/30/2015 | Invoice | | $4,546.50 | | | | $4,546.50 | 139 |
| 1163 | 5/31/2015 | Invoice | | $10,178.21 | | | $10,178.21 | | 108 |
| 1187 | 5/31/2015 | Invoice | | $2,857.80 | | | $2,857.80 | | 108 |
| 1191 | 5/31/2015 | Invoice | | $9,904.88 | | | $9,904.88 | | 108 |

*BusinessManager Aged Receivables by Invoice Date - HII Technologies, Inc.*

As of: 9/16/2015

| | | |
|---|---|---|
| **Customer Name:** | SANCHEZ OIL & GAS | |
| **Customer Code:** | SANCHEZ OIL & GAS | |
| **Phone:** | 713-783-8000 x3121 | |

| | | |
|---|---|---|
| Credit Limit: | $200,000.00 | Last Payment Date: 8/31/2015 |
| Insurance Limit: | $.00 | Last Payment Amount: $3,556.01 |
| Default Pymt. Term: | Net 151 | |

| | |
|---|---|
| Total AR Balance / %: | $292,144.99 / 8.02% |
| Funded Balance / %: | $265,408.90 / 28.68% |
| Unapplied Credits: | $0.00 |

| Doc Nbr | Trans Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 1192 | 5/31/2015 | Invoice | | $13,206.50 | | | $13,206.50 | | 108 |
| 1193 | 5/31/2015 | Invoice | | $13,206.50 | | | $13,206.50 | | 108 |
| 1194 | 5/31/2015 | Invoice | | $13,206.50 | | | $13,206.50 | | 108 |
| 1195 | 5/31/2015 | Invoice | | $13,206.50 | | | $13,206.50 | | 108 |
| 1196 | 5/31/2015 | Invoice | | $5,536.99 | | | $5,536.99 | | 108 |
| 1197 | 5/31/2015 | Invoice | | $2,349.03 | | | $2,349.03 | | 108 |
| 1198 | 5/31/2015 | Invoice | | $2,349.03 | | | $2,349.03 | | 108 |
| 1199 | 5/31/2015 | Invoice | | $3,187.96 | | | $3,187.96 | | 108 |
| 1200 | 5/31/2015 | Invoice | | $5,369.20 | | | $5,369.20 | | 108 |
| 1201 | 5/31/2015 | Invoice | | $1,510.09 | | | $1,510.09 | | 108 |
| 1213 | 5/31/2015 | Invoice | | $10,013.13 | | | $10,013.13 | | 108 |
| 1214 | 6/5/2015 | Invoice | | $16,061.59 | | | $16,061.59 | | 103 |
| 1215 | 5/31/2015 | Invoice | | $3,020.18 | | | $3,020.18 | | 108 |
| 1216 | 5/31/2015 | Invoice | | $4,530.26 | | | $4,530.26 | | 108 |
| 1217 | 5/31/2015 | Invoice | | $2,516.81 | | | $2,516.81 | | 108 |
| 1218 | 5/31/2015 | Invoice | | $1,510.09 | | | $1,510.09 | | 108 |
| 1219 | 5/31/2015 | Invoice | | $2,240.78 | | | $2,240.78 | | 108 |
| 1220 | 5/31/2015 | Invoice | | $1,510.09 | | | $1,510.09 | | 108 |
| 1221 | 5/31/2015 | Invoice | | $4,530.26 | | | $4,530.26 | | 108 |
| 1222 | 5/31/2015 | Invoice | | $1,510.09 | | | $1,510.09 | | 108 |
| 1223 | 5/31/2015 | Invoice | | $3,020.18 | | | $3,020.18 | | 108 |
| 1224 | 5/31/2015 | Invoice | | $3,020.18 | | | $3,020.18 | | 108 |
| 1225 | 5/31/2015 | Invoice | | $676.56 | | | $676.56 | | 108 |
| 1226 | 5/31/2015 | Invoice | | $519.60 | | | $519.60 | | 108 |
| 1227 | 5/31/2015 | Invoice | | $681.98 | | | $681.98 | | 108 |
| 1228 | 5/31/2015 | Invoice | | $519.60 | | | $519.60 | | 108 |

*BusinessManager Aged Receivables by Invoice Date - HII Technologies, Inc.*

As of: 9/16/2015

| Customer Name: | SANCHEZ OIL & GAS | Credit Limit: | $200,000.00 | Last Payment Date: | 8/31/2015 | Total AR Balance / %: | $292,144.99 / 8.02% |
|---|---|---|---|---|---|---|---|
| Customer Code: | SANCHEZ OIL & GAS | Insurance Limit: | $.00 | Last Payment Amount: | | Funded Balance / %: | $255,408.90 / 28.68% |
| Phone: | 713-783-8000 x3121 | Default Pymt. Term: | Net 15 I | | | Unapplied Credits: | $0.00 |

| Doc Nbr | Trans Date | Type | Description | Original Inv. Amount | 0-60 | 61-90 | 91-120 | Over 120 | Age |
|---|---|---|---|---|---|---|---|---|---|
| 1229 | 5/21/2015 | Invoice | | $2,045.93 | | | $2,045.93 | | 118 |
| | | | Customer Totals: | $255,408.90 | $0.00 | $0.00 | $153,996.50 | $101,412.40 | $0.00 |

Business Totals:
Total A/R Balance: $3,641,973.61
Total Funded Balance: $890,680.71

Report Totals:
Total Customers Printed: 3
Unapplied Credits: $0.00

Aged 0-60: $0.00
Aged 61-90: $22,225.00
Aged 91-120: $594,082.18
Aged Over 120: $274,373.53
Aged: $0.00

Report Period

Run report as of: 9/16/2015

Report Filter Options

Customer type: Not Selected
Customer status: Not Selected
Exclude customers with A/R balances: Not Selected
Include only customers over credit limit: No

Transaction Filter Options

Transaction type: Invoices

BusinessManager Aged Receivables by Invoice Date - HII Technologies, Inc.

As of: 9/16/2015

Transaction status:                    Funded

**Aging Options**

Type:                                  Invoice Date

**Sort Options**

Primary Sort:          Customer Name          Order:  Ascending

Secondary Sort:        Document Number         Order:  Ascending